21 F.3d 1381
 146 L.R.R.M. (BNA) 2288, 127 Lab.Cas. P 11,072,
18 Employee Benefits Cas. 1070
 John R. ADCOX, et al., Plaintiffs-Appellants,
v.
TELEDYNE, INC.; Teledyne Industries, Inc., Teledyne Monarch
Rubber Division; United Rubber, Cork, Linoleum and Plastic
Workers of America International Union; and United Rubber
Workers Local Union No. 99, Defendants-Appellees.
 No. 93-3078.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 21, 1994.
Decided April 19, 1994.
 
 Mark Hilkert (briefed), Scanlon & Gearinger, Katherine C. Smith (argued and briefed), Wagner, Smith, Patterson & Yates, Akron, OH, for John R. Adcox, et al.
 Peter D. Post (argued and briefed), Beth L. Silver, Reed, Smith, Shaw & McClay, Pittsburgh, PA, Sheila M. Markley, Day, Ketterer, Raley, Wright & Rybolt, Canton, OH (briefed), for Teledyne, Inc., Teledyne Industries, Inc. and Teledyne Monarch Rubber Division.
 Peter D. Post, Reed, Smith, Shaw & McClay, Pittsburgh, PA, Sheila M. Markley, Day, Ketterer, Raley, Wright & Rybolt, Canton, OH, Charles R. Armstrong (briefed), Carolyn T. Wonders (argued and briefed), Akron, OH, for United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO-CLC and Local 99, United Rubber, Cork, Linoleum and Plastic Workers of America.
 Before: MILBURN and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 A group of former Teledyne employees appeals the district court's granting of summary judgment to defendants-appellees in the employees' suit seeking lost welfare benefits and damages under both the Labor Management Relations Act (LMRA), 29 U.S.C. Secs. 141 et seq., and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Secs. 1001 et seq. For the reasons discussed herein, we affirm.
 
 
 2
 * Plaintiffs-appellants are former employees of defendant Teledyne Monarch Rubber, a division of defendant Teledyne, Inc., and, while employed by Teledyne, were represented by defendants United Rubber, Cork, Linoleum and Plastic Workers of America International Union and its Local Union No. 99. A collective bargaining agreement, which became effective January 1, 1988, and expired at midnight on June 15, 1991, governed the terms of their employment. Teledyne and the Union had also negotiated a Pension, Insurance and Service Award Agreement, which ran to June 15, 1985, but automatically renewed itself annually, unless either party gave notice of its desire to terminate the Service Award Agreement. The Service Award Agreement provided for service awards upon retirement and "special distribution" benefits on discontinuance of plant operations; the "special distribution" benefit functions essentially as severance pay.
 
 
 3
 In January 1991, Teledyne announced it would cease operations at its Hartville, Ohio, plant (where plaintiffs worked), sell the assets, and terminate the employees on June 15, 1991, the date when the labor agreement expired. Teledyne and the Union then engaged in "effects bargaining" from January through June 1991 to resolve the impact of the proposed closing on the employees. On April 5, Teledyne notified the Union that it desired to "terminate all agreements, including the Collective Bargaining Agreements, effective 12:01 a.m. the 16th of June, 1991."
 
 
 4
 During these negotiations, the Union demanded that Teledyne provide the employees with various benefits, including continuation of health insurance for eighteen months; immediate, unreduced early pension benefits for all employees regardless of the length of service; and "special distribution" benefits based on the Service Award Agreement. Teledyne agreed to continue medical insurance for fourteen months after closure, but declined to increase pension benefits or lower pension eligibility requirements, declined to pay to any employee a Service Award Agreement benefit, and informed the Union that retiree medical benefits would cease on June 15, 1991.
 
 
 5
 The Service Award Agreement provided for the special distribution to be calculated on the basis of an employee's total earnings. The distribution was payable upon complete and permanent discontinuance of plant operations to each terminated employee with at least five years of service who was "not eligible for a pension under any pension plan" of Teledyne and who was not eligible for a service award for retirement. At the time of termination, each plaintiff had at least five years of service and each was entitled to a deferred vested pension under Teledyne's pension plan. During effects bargaining, the Union contended that "eligible for a pension" meant eligible for an immediate pension; Teledyne maintained that it meant eligible for any pension, including a deferred vested pension. Teledyne and the Union also disagreed as to whether the retiree medical benefit program was limited to the life of the collective bargaining agreement or to the life of each retiree.
 
 
 6
 As part of a tentative Plant Closing Agreement reached in early June 1991, Teledyne agreed to provide an immediate, lump-sum pension benefit option (thereby giving employees access to immediate cash); to pay the then-current premiums for a retiree medical program for the lifetime of each current retiree and each active employee who was eligible to begin receiving an immediate pension benefit on July 1, 1991, and who did not take the lump-sum pension benefit; to continue active employees' health insurance for fourteen months or buy out that insurance on a lump-sum cash basis; and to increase the earnings permitted to recipients of certain pension benefits. The Union, as part of the compromise, agreed to a comprehensive release of claims, including a release concerning any Service Award Agreement benefits.
 
 
 7
 At Union meetings on June 14, June 15, and June 28, Union representatives explained to the employees the Plant Closing Agreement, including that there was substantial doubt whether the employees were entitled to the special distribution under the terms of the Service Award Agreement and that there was an equal chance of prevailing or losing in litigation. Dorothy Bixler, a union official and one of the plaintiffs-appellants, explained that if they received the special distribution it would be set off against their pension. The employees at the June 14 meeting voted not to ratify the Plant Closing Agreement. A subsequent telephone poll of employees showed that a majority of the employees contacted wanted another vote. However, at the June 28 meeting, held to decide whether there should be another vote, the majority voted against reconsideration of the agreement.
 
 
 8
 In July 1991, withdrawal cards were issued by the International to the members of Local No. 99, except to the officers. Members receiving such cards forfeit all rights and privileges in the Union. A withdrawal card is automatically issued to a terminated employee who has not applied for a dues waiver and enables the employee to have his membership rights and privileges restored if subsequently hired at another plant organized by the United Rubber Workers.
 
 
 9
 In early August, Teledyne increased its offer concerning the buy-out of health insurance from $500 to $600 for single coverage and from $1000 to $1200 for family coverage. The Union polled the membership through the use of postcards; a majority indicated that they wanted to reconsider the agreement. A vote by secret ballot was held on August 22, 1991, and the majority ratified the Plant Closing Agreement. The Agreement was signed by the Union and Teledyne on August 26, effective retroactive to June 15, 1991. The Agreement has been fully implemented.
 
 
 10
 There is some dispute as to whether the Union constitution authorizes the procedures used (i.e., postcard polling and secret ballot without a meeting). Plaintiffs also claim that many of the voters thought they were voting on Teledyne's proposed changes, not the agreement as a whole; that the Union told them that if it were not approved, retirees would lose their health coverage, employees would not be able to get their vested pension money, and employees would not get their pension money at all if they insisted on receiving the special distribution; and that the Union denied them additional information and an opportunity to debate and organize opposition to the plan. A protest to Local No. 99 was denied, as was a request for reconsideration. Appeals to the International were similarly denied, because the appellants were no longer members.
 
 
 11
 Plaintiffs filed suit in December 1991, alleging that Teledyne's failure to pay the special distribution benefits was a breach of contract under Sec. 301 of the LMRA and that the Union violated its duty of fair representation under Sec. 9(a) of the LMRA (count I). Plaintiffs also asserted that the special distribution award was an employee welfare benefit plan under ERISA and that Teledyne's denial of benefits violated ERISA (count II). In count III, plaintiffs alleged that Teledyne breached its fiduciary duty to them under ERISA. Finally, plaintiffs alleged that Teledyne interfered with their exercise of rights protected by ERISA (count IV). Plaintiffs sought compensatory and punitive damages and attorney's fees.
 
 
 12
 The district court granted summary judgment for defendants and denied plaintiffs' motion for summary judgment, for the reasons explained below. 810 F.Supp. 909. Plaintiffs appeal to this court.
 
 II
 
 13
 This court reviews a grant of summary judgment de novo. Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). All reasonable inferences must be made in favor of the non-moving party in determining if a genuine issue of material fact exists. Kunz v. United Food & Commercial Workers, Local 876, 5 F.3d 1006, 1008-09 (6th Cir.1993). Viewing the evidence in the light most favorable to the non-moving party, Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), this court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986). "The 'mere possibility' of a factual dispute is not enough." Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992) (quoting Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir.1986)).
 
 
 14
 * 1. Sec. 301 Claim Against Teledyne.
 
 
 15
 Count I of the complaint alleges that Teledyne failed to pay the special distribution, in violation of the collective bargaining agreement, and made material misrepresentations upon which plaintiffs detrimentally relied. Count I is premised on Sec. 301 of the LMRA, 29 U.S.C. Sec. 185. Section 301 confers jurisdiction on the district court over claims for breach of collective bargaining agreements. 29 U.S.C. Sec. 185(a). The district court noted that, to find that Teledyne's failure to pay the special distributions contained in the 1988 collective bargaining agreement is a breach, it must first find that the provisions of that agreement were still in force. The Plant Closing Agreement, however, released all relevant claims under the 1988 collective bargaining agreement.[1] Thus, if valid, the Plant Closing Agreement precludes plaintiffs' Sec. 301 claim against Teledyne; the district court determined that it lacked jurisdiction to determine the "validity" of the superseding agreement. Therefore, it dismissed count I.
 
 
 16
 In Huessner v. National Gypsum Co., 887 F.2d 672, 676 (6th Cir.1989), we determined that a district court lacked jurisdiction under Sec. 301(a) over questions of the validity of collective bargaining contracts. Thus, the district court here properly determined that it lacked jurisdiction to entertain a challenge under Sec. 301 to the validity of the Plant Closing Agreement. Because that Agreement superseded the 1988 collective bargaining agreement, including the Service Award Agreement, upon which plaintiffs' Sec. 301 claim against Teledyne depends, there was no breach here that would support a Sec. 301 claim.
 
 
 17
 Plaintiffs rely on Central Transport, Inc. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO, 805 F.Supp. 26, 28 (E.D.Mich.1992), which held that Huessner precludes district court jurisdiction over determining the validity of a collective bargaining agreement, but not jurisdiction to determine whether an agreement ever existed. Plaintiffs argue that, under basic principles of contract law, a superseding contract never existed here, because there were no Union members to adopt the agreement (their membership in the union had terminated with the issuance of withdrawal cards), because there had been no required meeting at which the members could vote, because there was no consideration (they gave up "vested" special distribution benefits in return for "nothing"),[2] and because Teledyne was guilty of "overreaching" (therefore the agreement is unconscionable); for these reasons, plaintiffs argue, the superseding contract is void.
 
 
 18
 Whatever the merits of the Central Transport decision, Huessner is the law in the Sixth Circuit and so governs the outcome of this case. Here, the Plant Closing Agreement was signed by the Union and Teledyne and on its face purports to be a valid, existing contract. Plaintiffs' claims go to its "validity," not its existence--just as plaintiff's claim in Huessner, that the agreement there had been procured through "fraud, duress, coercion, and intimidation" and failure to bargain in good faith, went to the agreement's "validity."
 
 
 19
 2. Sec. 301 Claim Against the Union.
 
 
 20
 Count I also alleges that the Union violated its duty of fair representation under Sec. 9(a) of the LMRA, 29 U.S.C. Sec. 159(a), and that the violation is "actionable under Section 301 of the LMRA, 29 U.S.C. Section 185, and/or 28 U.S.C. Section 1337(a)." The district court concluded that this part of count I must also be dismissed because it asserted a hybrid Sec. 301 claim and, for the reasons stated above, plaintiffs cannot satisfy the part of the hybrid Sec. 301 test requiring a showing of a breach of a collective bargaining agreement.
 
 
 21
 In a hybrid suit under Sec. 301, to recover against either the employer or the union, a plaintiff must show that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation. White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir.1990). "Unless [plaintiff] demonstrates both violations, he cannot succeed against either party." Id. at 560. For the reasons stated above, there was no breach of a collective bargaining agreement here, and therefore plaintiffs' hybrid Sec. 301 claim must fail.
 
 
 22
 However, plaintiffs also assert a Sec. 9(a) breach of duty of fair representation claim in count I and purport to base jurisdiction on 28 U.S.C. Sec. 1337. Section 1337 confers jurisdiction on the district court over any civil action arising under federal statutes regulating commerce. A union's duty of fair representation "arises out of the exclusive power granted unions by Sec. 9(a) ... and when breached gives rise to a claim within the jurisdiction of the district courts under 28 U.S.C. Sec. 1337." Storey v. Local 327, 759 F.2d 517, 518-19 (6th Cir.1985). In Storey, we noted that the district court properly held that Sec. 301(a) did not provide a basis for the plaintiffs' claim of breach of duty of fair representation. Id. at 518. However, "by asserting that the defendants violated section 9(a) of the Labor Act and relying on 28 U.S.C. Sec. 1337 [in addition to relying on Sec. 301], ... the plaintiffs properly framed their complaint for district court jurisdiction." Id. at 523.
 
 
 23
 In White, 899 F.2d at 561-62, however, we found that plaintiff's "complaint, although alleging jurisdiction under both section 301 of the LMRA and 28 U.S.C. Sec. 1337, stated a quintessential hybrid 301 claim." Plaintiff's complaint in White stated: "This is a complaint of breach of a collective bargaining agreement arising from plaintiff's discharge from the employment of the defendant employer without just cause, and of the duty of fair representation by plaintiff's union in processing his grievance." Id. at 560 n. 9. We found this to be "a succinct and unequivocal expression of a classic hybrid 301 cause of action." Ibid. Therefore, because plaintiff in White had failed to prove that the employer breached the collective bargaining agreement, he "should not be permitted to circumvent the logic of Bagsby [v. Lewis Bros., Inc., of Tennessee, 820 F.2d 799, 801 (6th Cir.1987) (stating that plaintiff must show both violations in hybrid Sec. 301 action),] and reach the jury with his claim that [the union] breached its duty of fair representation solely by virtue of artful pleading." White, 899 F.2d at 562. White also explained that "[i]n hybrid 301 claims, ... the interrelationship between a union member, his union, and his employer is implicated." Id. at 561.
 
 
 24
 As this court subsequently noted, "White seemed to create a test which required that if a plaintiff's complaint stated a 'colorable claim' under the collective bargaining agreement, it must be construed as a Section 301 claim rather than a Section 9(a) claim." Pratt v. United Auto., Aerospace & Agr. Implement Wkrs. of Am., Local 1435, 939 F.2d 385, 389 (6th Cir.1991). In Pratt, plaintiff had named as defendant only the union and had alleged only that the union failed to assist him in resolving difficulties regarding his absences from work; without more, the complaint did not state a hybrid 301 claim. Ibid.
 
 
 25
 A review of the complaint here indicates that plaintiffs' Sec. 9(a) claim is actually a hybrid Sec. 301 claim. The actions that the complaint alleges violate the Union's duty of fair representation all relate to ratifying the Plant Closing Agreement and thereby releasing all claims for benefits under the 1988 collective bargaining agreement. The complaint thus makes a "colorable claim" under the collective bargaining agreement: plaintiffs are alleging that the Union's actions divested them of their benefits under the 1988 agreement. Plaintiffs' claim is that Teledyne breached the collective bargaining agreement by not paying out the special distributions and that the Union breached its duty of fair representation in enabling Teledyne to do that under the authority of a superseding agreement. Just as in White, the complaint states a hybrid Sec. 301 claim.
 
 
 26
 Because it is properly construed as a hybrid Sec. 301 claim, plaintiffs' claim in count I against the Union should be dismissed because, for the reasons stated above, there has not been a breach of a collective bargaining agreement. The district court's dismissal of count I was proper.
 
 
 27
 Even if the claim in count I against the Union were construed as an independent cause of action cognizable under Sec. 9(a) and 28 U.S.C. Sec. 1337, summary judgment still would be appropriate because plaintiffs would be unable to satisfy the standards of Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). There, the Court indicated that a union breaches its duty of fair representation only if its actions are either arbitrary, discriminatory, or in bad faith; that the rule applies to all union activity; and that a union's actions are "arbitrary" only if, in light of the factual and legal landscape at the time of the union's actions, its behavior is so far outside a wide range of reasonableness as to be irrational. 499 U.S. at 67, 111 S.Ct. at 1130. See also Ackley v. Local Union 337, 948 F.2d 267 (6th Cir.1991) (same). "O'Neill mandates that a deferential standard of review be utilized in evaluating a union's actions." Nida v. Plant Protection Ass'n Nat'l, 7 F.3d 522, 526 (6th Cir.1993).
 
 
 28
 Plaintiffs argue that the Union violated its duty of fair representation by negotiating at all, because the special distribution payments had vested; by paying inordinate attention to ensuring that retirees' medical benefits were provided for, to the detriment of the active employees; and by acting arbitrarily in not fighting for the special distribution payments and in calling for repeated votes on a proposal that the employees had rejected.
 
 
 29
 The only factual issue in dispute appears to be whether the Union followed its rules in conducting the three votes. There is no dispute that the Union was concerned about the strong possibility of lengthy litigation over the pension benefits. Even viewed favorably to plaintiffs, but recognizing O'Neill 's mandate that the Union's actions be evaluated with deference, the Union's actions in negotiating and getting ratified the Plant Closing Agreement were not irrational, in view of its belief that litigation would result and that its chances of prevailing were uncertain. Thus, while the Union's membership in the preceding year had rejected a proposed sale of the Hartville plant to another company (which would have preserved employees' jobs) because the members thought their severance pay was protected, the landscape had changed by the time effects bargaining was underway: the plant was closing, and Teledyne contested the payment of the special distribution benefits. Further, it is "at least as plausible," see Perry v. Million Air, 943 F.2d 616, 620 (6th Cir.1991), that the Union thought it had reached the best solution possible after months of negotiation and thus a finding of bad faith would not be warranted. Plaintiffs point to no evidence of hostility or animosity on the part of the Union. Thus, because the Union's actions were not irrational and not taken in bad faith, summary judgment for the Union was appropriate.
 
 
 30
 In sum, the district court properly dismissed Count I.
 
 B
 
 31
 Count II alleges that Teledyne violated 29 U.S.C. Sec. 1132(a)(1)(B) by denying plaintiffs "pertinent information with regard to their respective welfare benefit plans" and denying them "their full benefits due them under the welfare benefit plan" (i.e., the special distribution payment plan). Section 1132(a)(1)(B) allows a plan participant or beneficiary to bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The district court dismissed this count because it was premised on the superseded 1988 collective bargaining agreement and the court therefore did not have jurisdiction over an ERISA claim premised on the invalidity of the superseding agreement. Plaintiffs argue that the special distribution benefits were vested and that Teledyne is estopped from denying that they were because plaintiffs relied on Teledyne's representations that they would receive those vested benefits.
 
 
 32
 Huessner resolves this issue, as well. There, we determined that Sec. 301(a) of the LMRA did not confer on a district court jurisdiction over questions of the validity of a collective bargaining agreement. We also held that plaintiff's ERISA claims, brought under 29 U.S.C. Sec. 1132 to collect from the employer unpaid benefit plan contributions (thus, apparently a Sec. 1132(a)(1)(B) action), did not provide an independent basis for district court jurisdiction based on a superseded collective bargaining agreement. Huessner, 887 F.2d at 677. We reasoned that the earlier, superseded collective bargaining agreement would have to be "in force" for the district court to have jurisdiction over those claims under Sec. 1132; because it had "expired" when a subsequent superseding agreement was made, it was no longer "in force" and thus the district court lacked jurisdiction to enforce it.
 
 
 33
 Thus, the district court's decision here was proper. The collective bargaining agreement, including the Service Award Agreement, had been superseded by the Plant Closing Agreement, and the district court lacked jurisdiction under Sec. 1132 to entertain a challenge to the Plant Closing Agreement's validity. Because, therefore, the collective bargaining agreement pursuant to which plaintiffs seek the special distribution benefits is no longer "in force," the district court lacked subject matter jurisdiction over the count II claim.
 
 
 34
 Plaintiffs assert that the special distribution benefits had "vested" contractually before termination of the collective bargaining and Service Award agreements, and that therefore the Union could not bargain them away and Teledyne cannot refuse to pay them.[3] This court has recognized that "Congress explicitly exempted welfare plans, as opposed to pension plans, from ERISA's vesting requirements." Gordon v. Barnes Pumps, Inc., 999 F.2d 133, 136 (6th Cir.1993) (citing 29 U.S.C. Secs. 1051 and 1081). We are mindful of "Congress' considered decision that welfare benefit plans not be subject to a vesting requirement." Adams v. Avondale Industries, Inc., 905 F.2d 943, 949 (6th Cir.), cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990). We have also noted, however, that "under certain circumstances," employee welfare plan benefits may vest contractually. Gordon, 999 F.2d at 136 n. 2; Adams, 905 F.2d at 949; In re White Farm Equipment Co., 788 F.2d 1186, 1193 (6th Cir.1986).
 
 
 35
 After examining the terms of the Special Award Agreement, we conclude that the special distribution benefits here did not vest by contract. The Agreement specifies that a special distribution is payable to an employee with at least five years' experience and "who is not eligible for a pension under any pension plan" of Teledyne. Undisputedly, each employee here was eligible for at least a deferred pension from Teledyne. Plaintiffs interpret this pension-eligibility provision to mean eligible for an immediate pension. We read the clause differently: It states, "eligible for a pension under any pension plan," which would include deferred pensions. Plaintiffs argue that inclusion of deferred pensions in the pension-eligibility clause would render the Agreement's "promise" of special distribution payments illusory, because after five years of service, which is one requirement to be eligible for a special distribution payment, every employee is eligible for a deferred pension, and so no payments would ever be made. However, as Teledyne points out, and plaintiffs do not dispute, when the Service Award Agreement was executed and for several years thereafter, it was possible (indeed, according to Teledyne, more likely) that an employee would qualify for a service award or special distribution payment without qualifying for vested pensions. The fact that Teledyne's pension plan could and did change as to its vesting provisions with no corresponding change in the Service Award Agreement does not render the latter's pension-eligibility provision inoperative. Plaintiffs fail to satisfy the pension-eligibility provision of the Service Award Agreement, and thus no special distribution benefits vested.
 
 
 36
 Plaintiffs also rely on Armistead v. Vernitron Corp., 944 F.2d 1287 (6th Cir.1991), and assert that Teledyne should be estopped from denying that the special distribution benefits had vested. Armistead explained that the doctrine of equitable estoppel applied in an insurance benefit plan case under Sec. 1132(a) and required a showing of the following five elements: (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the party to be estopped; (3) an intention by the party to be estopped that the representation be acted upon, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; (4) unawareness of the true facts by the party asserting estoppel; and (5) detrimental and justifiable reliance by the party asserting estoppel on the representation. 944 F.2d at 1298. Plaintiffs present very little argument as to why equitable estoppel would compel Teledyne to pay out any special distribution benefits. Even if Armistead applied here, plaintiffs would not survive summary judgment because they point to no evidence that would support their claim. Their argument amounts to the following: "For years, even through the period preceding the plant closing, Teledyne had the benefit of the promise." In other words, plaintiffs thought that they were entitled to the special distribution benefits and therefore Teledyne is estopped from denying it. Plaintiffs allege no explicit statements of the kind made in Armistead that would indicate that Teledyne represented to the Union or to the employees that they would be receiving the special distribution benefits; thus, they could not show that they relied on any representation. Plaintiffs fail the first and fifth elements of Armistead.
 
 
 37
 Arguably, the statement of the facts in plaintiffs' brief might provide some facts to defeat a summary judgment motion. Plaintiffs note that, in 1988, Teledyne had provided $10,000 in "Severance Pay" to 100 employees affected by a plant closure due to the transfer of a product line; that it was during effects bargaining that Teledyne for the first time asserted that no one was entitled to a special distribution payment; and that during effects bargaining, Teledyne calculated severance pay pursuant to the formula in the special distribution benefits agreement. However, there is no evidence to suggest that the $10,000 "Severance Pay" was paid pursuant to the special distribution benefits agreement or that Teledyne represented that it would be available for the 1991 Hartville plant closing. Even if Teledyne did not state that the employees would not receive the special distribution benefits until effects bargaining began, no evidence suggests that Teledyne ever represented that the employees were entitled to the special distribution benefits. Finally, the record does not indicate the reason Teledyne calculated the amount of the benefits; absent any representations by Teledyne, to conclude that Teledyne's calculation indicates that Teledyne thought the employees were entitled to the benefits would be speculation. Summary judgment for Teledyne on the claim of equitable estoppel under Armistead is warranted.
 
 C
 
 38
 Count III of the complaint alleges that "Teledyne, as a fiduciary to the Plaintiffs' benefit plans, made material misrepresentations to Plaintiffs, upon which Plaintiffs relied to their detriment; failed to act in accordance with plan documents; acted in a manner adverse to the Plaintiffs' interests as beneficiaries; and terminated Plaintiffs' interests in its benefit plan." Count III is premised on violations of 29 U.S.C. Secs. 1104 and 1132(a). The district court dismissed this count because a breach of fiduciary duty claim under Sec. 1132(a) can only be brought on behalf of the plan, not on behalf of the beneficiaries, as was plaintiffs' claim. Plaintiffs argue that their special distribution benefits were vested and that Teledyne had made representations to them that they were entitled to those benefits.
 
 
 39
 "[S]uits under ERISA for breach of fiduciary duty arise under 29 U.S.C. Sec. 1132(a)(2), which allows beneficiaries of a plan ... to seek relief under 29 U.S.C. Sec. 1109." Bryant v. International Fruit Product Co., 886 F.2d 132, 135 (6th Cir.1989); 29 U.S.C. Sec. 1132(a)(2) (civil action may be brought "by a participant, beneficiary or fiduciary for appropriate relief under section 1109"). Section 1109 provides:
 
 
 40
 Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.
 
 
 41
 29 U.S.C. Sec. 1109(a). Section 1104 sets forth the duties and obligations imposed on fiduciaries. 29 U.S.C. Sec. 1104.
 
 
 42
 "Conversely, individual suits for recovery of denied benefits arise under 29 U.S.C. Sec. 1132(a)(1)(B)." Bryant, 886 F.2d at 135. Here, plaintiffs seek recovery on their own behalf, not on behalf of the plan. Thus, the district court properly dismissed count III because a cause of action under Sec. 1132(a)(2) permits recovery to inure only to the ERISA plan, not to individual beneficiaries. Ibid.; Tregoning v. American Community Mut. Ins. Co., 12 F.3d 79, 83 (6th Cir.1993) (Sec. 1109 provides relief only for a plan and not for individual participants).D
 
 
 43
 Count IV of the complaint, premised on 29 U.S.C. Sec. 1140, alleges that Teledyne interfered with plaintiffs' exercise of rights protected under ERISA. Plaintiffs' claim that Teledyne coerced them into ratifying the Plant Closing Agreement, thereby interfering with their rights under the 1988 agreement. The district court determined that Sec. 1140 did not apply here because plaintiffs undisputedly were going to be terminated whether or not the Plant Closing Agreement was ratified and, further, that Teledyne's conduct affected only the terms of the pension plan, not the employment relationship as contemplated by Congress.
 
 29 U.S.C. Sec. 1140 provides:
 
 44
 It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter....
 
 
 45
 "The legislative history reveals that the prohibitions of [Sec. 1140] were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." West v. Butler, 621 F.2d 240, 245 (6th Cir.1980); Varhola v. Doe, 820 F.2d 809, 816 (6th Cir.1987). "Congress designed [Sec. 1140] primarily to protect the employment relationship that gives rise to an individual's pension rights." West, 621 F.2d at 245. For conduct to fall within the parameters of Sec. 1140, it "must affect the individual's employment relationship in some substantial way." Id. at 245-46. Section 1140 "does not purport to protect the financial security of pension funds." Id. at 246.
 
 
 46
 The district court properly granted summary judgment to Teledyne on this count. Teledyne's conduct does not fall within the scope of Sec. 1140. No evidence suggests that Teledyne terminated or harassed the employees or otherwise altered the employment relationship to divest the employees of any benefits to which they were entitled. Rather, the employment decision was made, and then negotiations over (and finally ratification of) the Plant Closing Agreement took place. Plaintiffs cite no evidence that would support a claim under Sec. 1140.
 
 III
 
 47
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The Plant Closing Agreement did not release "obligations arising under this Agreement or health-related claims such as workers' compensation claims," which are not at issue in this case
 
 
 [2]
 This argument regarding lack of consideration is unpersuasive. Plaintiffs avoided litigation in exchange for certain, immediate, lump-sum cash payments
 
 
 [3]
 Plaintiffs contend that the Service Award Agreement is still in effect, because the terms of its termination clause, which require Teledyne to send notice to the Union more than 60 but less than 75 days before June 15 if Teledyne desires to terminate the Agreement, have not been met. Brief of Appellants at 34. A letter from Teledyne providing such notice, however, appears in the record. See J.A. at 566