Jim BURKLOW, et al. Plaintiffs

v.

BASKIN–ROBBINS USA, CO. and International Brotherhood of Teamsters, A.F.L., C.I.O. Local Union No. 783 Defendants

No. CIV.A.4:01–CV–147–M.

United States District Court,
W.D. Kentucky,
Owensboro Division.

July 22, 2003.

900

Shealia L. Murphy, Charles S. Wible, Owensboro, for Plaintiffs.

Paul Heylman, Schmeltzer, Aptaker & Shepard, P.C., Washington, D.C., for Defendant, Baskin Robbins USA, Co.

Herbert L. Segal, Segal, Steward, Cutler, Lindsay, Janes & Berry PLLC, Louisville, for Defendant International Brotherhood of Teamsters, Local 783.

## MEMORANDUM OPINION AND ORDERS

McKINLEY, District Judge.

This matter is before the Court on motions for summary judgment filed by Defendant, Baskin–Robbins USA, Co. ("Baskin–Robbins") [DN 42], and by Co-Defendant, International Brotherhood of Teamsters, A.F.L., C.I.O. Local Union No. 783 ("Local 783" or "the Union") [DN 45]. Having been fully briefed, these matters now stand ripe for decision. For the reasons set forth below, both motions are **GRANTED**.

## I. BACKGROUND

This case arises from the closing of the Baskin–Robbins ice cream plant in Owensboro, Kentucky. Plaintiffs are former Baskin–Robbins employees who, at all times pertinent to this litigation, were represented by Local 783. In 1998, Baskin–Robbins and Local 783 negotiated a collective bargaining agreement ("1998 CBA") effective through 2002. During those negotiations, the Union expressed concern about the possibility that Baskin–Robbins might sell the plant to another employer who would reduce employee wages or benefits. In response to this concern, Baskin–Robbins agreed to an Addendum to the 1998 CBA, entitled "Successors and Assigns Clause" ("S & A Clause"), requiring it to pay the greater of $1 million or all wages and benefits due under the agreement in the event that the plant was sold to a buyer that refused to abide by its terms.

On January 12, 2001, Baskin–Robbins announced that, as a result of its decision to outsource the manufacture of its ice cream to Dean Foods, the Owensboro plant would cease operations on March 15, 2001. On January 16, 2001, the Union filed a grievance under the 1998 CBA

claiming that the plant closing was covered by the S & A Clause and that the employees were therefore entitled to their wages and benefits due for the remainder of the agreement or $1 million, whichever was greater. Baskin–Robbins denied the grievance, however, maintaining that the S & A Clause only applied in the event that the plant was sold to a "successor employer" and did not apply to a plant closing.

On January 25, 2001, Baskin–Robbins and Local 783 engaged in "effects bargaining" to resolve the impact of the plant closing on the employees. By the end of the second day of negotiations, Baskin–Robbins had presented a "last, best and final offer" to the Union which included: (1) a cash payout to each employee based on the employee's years of service; (2) a payout of accumulated sick pay; (3) six months of company-paid health insurance continuation; (4) a cash productivity bonus; and (5) a program to assist employees in finding new employment.

Baskin–Robbins' "last, best, and final offer" was subsequently memorialized in a letter ("Offer Letter") from Baskin–Robbins' counsel to Union representative Jerry Vincent ("Vincent"). The Offer Letter set forth the terms of Baskin–Robbins' offer and made it clear that "this last, best and final offer represents the Company's proposal for full settlement of all matters arising at the Owensboro plant, including the plant closing and pending grievance regarding same." (Letter from Paul Heylman to Vincent of 02/02/01, at 3.)

On February 25, 2001, the Union convened a meeting to vote on whether to accept or reject the terms of Baskin–Robbins' offer. As set forth above, the Offer Letter clearly stated that acceptance of the offer would settle all claims relating to the Owensboro plant, including the pending grievance. At the ratification meeting, however, Vincent allegedly assured the employees that acceptance of the offer would have no bearing on their ability to pursue the grievance. Ultimately, the employees voted to accept Baskin–Robbins' offer by a margin of 59–17.

After the vote, Union business representative Todd Thomason ("Thomason") formally accepted Baskin–Robbins' offer on behalf of the Union by writing "Accepted and Agreed" and signing his name on the last page of the Offer Letter. Soon thereafter, the parties executed a new agreement reaffirming Thomason's acceptance of the Offer Letter, but providing an exception in the event that Baskin–Robbins sold the plant to another company that manufactured ice cream during the term of the 1998 CBA. The parties' new agreement ("Closing Agreement") expressly provided that:

> This agreement is a full settlement and release of all grievances and claims relating to the plant closing and the contract. Specifically, the parties agree that there will be no claim raised that the Company was obligated to pay out anything more than the Company's last, best and final offer of February 1, 2001
> . . . .

Baskin–Robbins proceeded to pay out all amounts due under the Closing Agreement. Nonetheless, many of the former employees felt that they had been deceived throughout the plant closing process by both their employer and their union—especially regarding their ability to pursue the grievance. As a result, on August 31, 2001, Plaintiffs initiated the present lawsuit. Plaintiffs' original complaint asserted a "hybrid" claim under the Labor Management Relations Act ("LMRA") alleging that Baskin–Robbins had breached the 1998 CBA and that the Union had violated its duty of fair representation. On October 11, 2001, Plaintiffs filed an amended complaint, adding state law claims for fraud and civil conspiracy and attempting to join sixteen "new plaintiffs" not named

in the original complaint. Baskin–Robbins and the Union (collectively "Defendants") now move for summary judgment on Plaintiffs' claims against them.

## II. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Rule requires the non-moving party to present "*specific facts* showing there is a *genuine issue* for trial." Fed.R.Civ.P. 56(e) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

In support of their respective motions for summary judgment, Defendants argue:

(1) that this Court does not have subject matter jurisdiction over Plaintiffs' "hybrid" claim; (2) that Plaintiffs' state law claims are preempted by federal law; and (3) that even if this Court were to reach the merits of Plaintiffs' federal and state claims, those claims are nonetheless insufficient to withstand summary judgment. In addition, Defendants contend that the claims of the sixteen "new plaintiffs" are time barred and must be dismissed.

### A. Section 301 "Hybrid" Claim

Plaintiffs' "hybrid" claim, brought pursuant to Section 301 of the LMRA, alleges that Baskin–Robbins breached the 1998 CBA and that the Union violated its duty of fair representation. The Court will consider each part of Plaintiffs' "hybrid" claim in turn.

### 1. Section 301 Claim Against Baskin–Robbins

Section 301(a) of the LMRA provides that suits for "violation of contracts between an employer and a labor organization" may be brought in federal district court. 29 U.S.C. § 185(a). "Thus, under Section 301(a), district courts possess subject matter jurisdiction in cases involving an alleged violation of an existing collective bargaining contract." *Heussner v. Nat'l Gypsum Co.*, 887 F.2d 672, 676 (6th Cir. 1989). In this case, however, Defendants contend that this Court does not have subject matter jurisdiction over Plaintiffs' Section 301 claim against Baskin–Robbins because adjudication of that claim would first require the Court to adjudicate the validity of the Closing Agreement which superceded the 1998 CBA. In support of their contention, Defendants cite the Sixth Circuit's decision *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir.1994).

In *Adcox*, as here, the employer and local union engaged in "effects bargaining"

after the employer announced its intention to cease operations. The union demanded that the employer provide the employees with various benefits, including continuation of health insurance and early pension benefits for all employees regardless of the length of service. In addition, the union sought certain "special distribution" benefits (essentially severance pay) provided for in a collectively bargained "Service Award Agreement." The employer agreed to the union's demand for continued health insurance, but refused to pay the early pension benefits or special distribution benefits. Thereafter, following a majority vote by the employees, the union and the employer entered into a Plant Closing Agreement wherein the employer agreed to certain concessions in exchange for the union's comprehensive release of all claims, including a release concerning the special distribution benefits. Sometime after the Plant Closing Agreement was implemented, the employees brought a Section 301 "hybrid" claim alleging that the employer's failure to pay the special distribution benefits was a breach of contract under Section 301 and that the union had violated its duty of fair representation under Section 9(a) of the LMRA. The district court, however, dismissed the plaintiffs' "hybrid" claim for lack of subject matter jurisdiction, concluding that the collective bargaining agreement had been superceded by the Plant Closing Agreement and that it lacked jurisdiction to determine the validity of the superceding agreement.

The Sixth Circuit Court of Appeals, citing its earlier decision in *Heussner v. National Gypsum Co.*, 887 F.2d 672, 676 (6th Cir.1989) subsequently affirmed the district court's ruling, noting that:

> In [*Heussner*], we determined that a district court lacked jurisdiction under § 301(a) over questions of the validity of collective bargaining contracts. Thus, the district court here properly determined that it lacked jurisdiction to entertain a challenge under § 301 to the validity of the Plant Closing Agreement. Because that Agreement superceded the 1988 collective bargaining agreement, including the Service Award Agreement, upon which plaintiffs' § 301 claim against Teledyne depends, there was no breach here that would support a § 301 claim.

*Adcox*, 21 F.3d 1381 at 1386.

The rule applied in *Adcox* applies with equal force to the facts presented here.[1] To find that Baskin–Robbins breached the 1998 CBA, it must first be established that the provisions of that agreement were still in force. The Closing Agreement, however, expressly released all "grievances and claims relating to the plant closing and the contract." The Closing Agreement appears on its face to be a valid and binding collective bargaining agreement which expressly precludes Plaintiffs' claim that Baskin–Robbins breached the 1998 CBA. Thus, in order to prevail on their claims here, the Plaintiffs must prove that the

---

**1.** Plaintiffs' contention that *Adcox* was implicitly overruled by the United States Supreme Court's decision in *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. U.A.W.*, 523 U.S. 653, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) is unpersuasive. That case stands for the proposition that "if, in the course of deciding whether a plaintiff is entitled to relief for the defendant's alleged violation of a contract, the defendant interposes the affirmative defense that the contract was invalid, the court may, consistent with § 301(a), adjudicate that defense." *Id.* at 658, 118 S.Ct. 1626 (citation omitted). In the present case, however, the 1998 CBA was expressly superceded by the Closing Agreement, and Defendants do not assert any affirmative defenses relating to the validity of the Closing Agreement. Thus, *Textron* is inapposite; *Adcox* and *Heussner* remain the law in the Sixth Circuit and so govern the outcome of this case.

Closing Agreement is not valid and binding. Like the district court in *Adcox*, however, this Court lacks jurisdiction to determine the validity of the Closing Agreement. Accordingly, Baskin–Robbins is entitled to summary judgment on Plaintiffs' Section 301 claim.

### 2. Section 301 Claim Against the Union

The second part of Plaintiffs' Section 301 "hybrid" claim alleges that Local 783 violated its duty of fair representation under § 9(a) of the LMRA, 29 U.S.C. § 159(a). "In a hybrid suit under § 301, to recover against either the employer or the union, a plaintiff must show that the employer breached the collective bargaining agreement *and* that the union breached its duty of fair representation." *Adcox*, 21 F.3d at 1386 (citing *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990)). As such, "[u]nless [the plaintiff] demonstrates both violations, he cannot succeed against either party." *White*, 899 F.2d at 560. Here, the Court has already determined that Plaintiffs cannot satisfy the part of the "hybrid" Section 301 test requiring a showing of a breach of a collective bargaining agreement. Thus, the second part of Plaintiffs' "hybrid" claim—that the Union violated its duty of fair representation under Section 9(a) of the LMRA—likewise cannot survive summary judgment.

### B. Preemption of State Law Claims

In addition to the § 301 "hybrid" claim discussed above, Plaintiffs assert state law claims for fraud and civil conspiracy. Defendants, however, insist that the Court need not even reach the merits of those claims because they are preempted by federal labor law.

### 1. Section 301 Preemption

Both defendants contend that Plaintiffs' state law claims are preempted by Section 301 of the LMRA. Section 301 gives federal courts jurisdiction over issues pertaining to collective bargaining agreements and has been construed by the Supreme Court as a grant from Congress to create a federal common law of labor contracts. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). As such, the Sixth Circuit has held that Section 301 effectively preempts certain state law claims:

> Since federal law is the exclusive law used to interpret the duties and obligations contained within collective bargaining agreements, any state law claim that is not independent of rights established by an agreement, and that is 'inextricably intertwined' with a determination of the meaning of the terms of an agreement, is preempted by section 301. Thus, if a state tort relies on or entails interpretation of a collective bargaining agreement, the state claim is preempted.

*Northwestern Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir. 2001) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 217–18, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)).

As set forth above, Section 301 has broad preemptive effect. Even so, "[t]he preemptive reach of Section 301 ... is by no means boundless." *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 799 (6th Cir.1990). Thus, even where a state law claim "requires a court to discuss and evaluate the same facts as it would when interpreting the agreement," there is no preemption "so long as the court is not actually interpreting the agreement." *Northwestern Ohio Adm'rs*, 270 F.3d at 1030 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)). Stated otherwise, "Section 301 preempts only state law claims that are 'substantially depen-

dent on analysis of a collective bargaining agreement,' . . . not claims that only 'tangentially' involve CBA provisions." *Fox,* 914 F.2d at 799–800 (internal citations omitted).

### a. Claims Against the Union

██ Plaintiffs have summarized the factual basis of their fraud claim against the Union as follows:

> [W]hen the Union discovered [that Baskin–Robbins intended to close the plant], it did nothing to assist the members to protect their rights and even led them to believe they could protect their rights under the successors and assigns clause by entering into a Plant Closing Agreement which on its face settled their good claims for breach of contract under the successors and assigns clause and anticipatory breach . . . .

(Pls. Resp. to Summ. J. at 25.) Elsewhere, Plaintiffs maintain that the Union made "false statements and omissions of fact . . . in order to induce Plaintiffs into remaining Baskin–Robbins employees to their detriment until the plant closed." *Id.* at 28.

According to Plaintiffs, preemption under Section 301 is not warranted because "[t]hese misrepresentations, . . . do not require interpretation of any contract provision to understand." *Id.* at 25. Although the Court agrees that Plaintiffs' claims would not require interpretation of the 1998 CBA, those claims are nonetheless preempted because they implicate the same facts underlying Plaintiffs' claim for breach of the duty of fair representation.

██ "An action for breach of duty of fair representation that directly implicates the grievance procedure of a collective bargaining agreement 'clearly falls within the ambit of section 301 preemption.' " *In re Glass, Molders, Pottery, Plastics & Allied*

*Workers Int'l Union,* 983 F.2d 725, 728 (6th Cir.1993) (quoting *Fox v. Parker Hannifin Corp.,* 914 F.2d 795, 802 (6th Cir.1990)). As such, where a plaintiff's state law tort claim is based upon the same factual allegations as his federal claim for breach of the duty of fair representation, the state claim is effectively preempted by federal labor law. *See id.* at 729 (holding that plaintiff's state law claims against union were preempted by federal law where state claims were related to union's duty of fair representation).

The Court finds that most, if not all, of the allegations set forth above arise from essentially the same facts and circumstances as Plaintiffs' claim for breach of the duty of fair representation. For example, in describing the conduct pertinent to their duty of fair representation claim, Plaintiffs' Amended Complaint alleges, *inter alia,* that the Union

> failed to fairly represent the Plaintiffs by informing members that they had to stay until the plant closed . . . in order to get their contract benefits, [and] by leading the Plaintiffs to believe that the contract liquidated damages clause would be addressed at a later date pursuant to the grievance procedure set out in the collective bargaining agreement, by leading the Plaintiffs to believe the severance package was separate from the liquidated damages clause . . . .

(Pls.' Am. Compl, Sec. XVI.) This conduct, it seems, is more or less identical to the conduct underlying Plaintiffs' fraud allegations. Accordingly, the state law fraud claims asserted against the Union are preempted by Section 301.

### b. Claims Against Baskin–Robbins

██ Plaintiffs have stipulated that their fraud claim against Baskin–Robbins relates exclusively to its alleged representations—verbal and otherwise [2]—that the

---

**2.** In addition to any verbal assurances made

by Baskin–Robbins, many employees also

Owensboro plant would remain viable for the duration of the 1998 CBA.[3] These alleged representations, however, appear to have been made independent from any promises contained in the 1998 CBA. As such, determining whether these representations were fraudulent would not require the Court to analyze or interpret the terms of the agreement. Thus, it cannot be said that the alleged representations regarding the future of the Owensboro plant are so "inextricably intertwined" with interpretation of the 1998 CBA as to be preempted by Section 301.

### 2. *Garmon* Preemption

 In the alternative, Baskin–Robbins argues that the state law claims asserted against it are preempted by the rule in *San Diego Building Trades v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Under *Garmon*, "[w]hen an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. 773. As such, "[t]he party arguing *Garmon* preemption bears the burden of showing that the conduct at issue is prohibited or protected by the [NLRA]." *Northwestern Ohio Adm'rs, Inc.*, 270 F.3d at 1027 (citing *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986)).

Section 8(d) of the NLRA requires employers to bargain in good faith with respect to "wages, hours and other terms and conditions of employment." 29 U.S.C. § 158(d).[4] Plaintiffs' Amended Complaint alleges that Baskin–Robbins made a host of fraudulent misrepresentations, including some that fall squarely within the scope of the NLRA.[5] In an effort to avoid *Garmon*, however, Plaintiffs now insist that "claims based on fraud and misrepresentations that infected the bargaining process and might constitute violations of the employer's duty to bargain in good faith, are not before the Court ...." (Pls.' Resp. to Summ. J. at 28.) Instead, Plaintiffs insist that their state law fraud claims

> are based on Baskin–Robbins' and the Union's false statements and omissions of fact, including Baskin–Robbins' intention to close the Owensboro plant, and the nature of Plaintiffs' rights under the various collective bargaining agreements at issue, *in order to induce Plaintiffs into remaining Baskin–Robbins employees to their detriment until the plant closed and to interfere with their (non-bargaining) rights to their detriment under the various contracts, such as pursuit of their rights under the successors and assigns clause.*

(Pls.' Resp. to Summ. J. at 28) (underlining in original).

Although not a model of clarity, the above-quoted language appears to stipulate that Plaintiffs' fraud claims against Baskin–Robbins arise exclusively from its

---

interpreted Baskin–Robbins' capital expenditures to improve the Owensboro plant as evidence that the plant would continue to operate.

**3.** *See* Part III.B.2, *infra*.

**4.** Section 7 of the NLRA—not at issue here—concerns the right of employees to organize and bargain collectively.

**5.** For instance, Plaintiffs Amended Complaint alleges that Baskin–Robbins made fraudulent misrepresentations (1) regarding the future of the Owensboro plant during negotiation of the 1998 CBA; and (2) regarding the ratification of the Plant Closing Agreement.

alleged misrepresentations regarding its intention to close the Owensboro plant—i.e., representing to the employees that the plant would continue to operate for the duration of the 1998 CBA. As such, the Court must determine whether such representations, if proven, would constitute conduct that is arguably prohibited by the NLRA. The Court finds that they would not.

Even if Baskin–Robbins did make false representations regarding the future of the plant to induce employees to remain there, such representations would not have implicated Baskin–Robbins' duty to bargain in good faith. The alleged representations were not made during the collective bargaining process, but rather, were made after the 1998 CBA was negotiated in an effort to deter the employees from seeking other employment. Thus, because Baskin–Robbins has failed to carry its burden of establishing that the conduct at issue is arguably prohibited by the NLRA, the Court finds that Plaintiffs' state law claims against Baskin–Robbins are not preempted by *Garmon*.

### C. Remaining State Law Claims

 As set forth above, of the myriad of fraud allegations set forth in Plaintiffs' Amended Complaint, only one survives preemption—namely, the allegation that Baskin–Robbins conspired with the Union to fraudulently induce employees to remain at the Owensboro plant by representing that the plant would remain viable for the duration of the 1998 CBA. Under Kentucky law, a plaintiff asserting fraud must prove six elements to prevail: (1) a material representation, (2) which is false,

(3) known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury. *United Parcel Serv. Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999) (citing *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d 357, 359 (Ky.Ct.App.1978)). Civil conspiracy, in turn, requires that a plaintiff prove "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson,* 95 S.W.3d 875, 897 (Ky.Ct.App.2002) (citing *Montgomery v. Milam,* 910 S.W.2d 237, 239 (Ky.1995)).

The Court finds that Plaintiffs have failed to establish genuine issues of material fact as to the required elements of their non-preempted state law claims. Plaintiffs' allegations of fraud and conspiracy rest entirely on vague generalizations with no specific proof. For example, as to Plaintiffs' fraud claim against Baskin–Robbins, the record is devoid of *any specific evidence* that Baskin–Robbins ever made a material representation regarding the future of the plant outside of the collective bargaining process.[6] Nor is there any evidence suggesting that Baskin–Robbins ever conspired with the Union to mislead the employees in any way. In the absence of such specific evidence, Plaintiffs' state law claims for fraud and civil conspiracy cannot survive summary judgment.

### IV. CONCLUSION AND ORDERS

Accordingly, and for the reasons set forth above, **IT IS HEREBY ORDERED** that the motions for summary judgment

---

6. Plaintiffs' only evidence of a specific representation made by Baskin–Robbins regarding the future of the plant appears in the deposition testimony of Plaintiff Ronnie Thomas ("Thomas"). According to Thomas, Baskin–Robbins negotiator Rick Morris made verbal assurances to the employees that they were guaranteed work for four years. (Thomas Dep. at 55.) Those alleged assurances, however, were made during collective bargaining of the 1998 CBA. Hence, any claim based on Morris's statements would be preempted by *Garmon*.

by Baskin–Robbins [DN 42] and the Union [DN 45] are **GRANTED.**[7]

## *JUDGMENT*

This matter having come before the Court on motions for summary judgment filed by defendant, Baskin–Robbins USA, Co. [DN 42], and by co-defendant, International Brotherhood of Teamsters, A.F.L., C.I.O. Local Union No. 783 [DN 45], and the Court on this date having issued a Memorandum Opinion and Orders addressing said motions,

**IT IS HEREBY ORDERED** that both motions for summary judgment are **GRANTED.**

**THIS IS A FINAL AND APPEALABLE ORDER AND THERE IS NO JUST CAUSE FOR DELAY.**

---

7. Having granted summary judgment in favor of Defendants on all of Plaintiffs' claims, the question of whether the claims of the "new plaintiffs" are time barred is moot.