James BOND, et al., Plaintiff–Appellant,

v.

UNITED STEEL WORKERS OF AMERICA, AFL–CIO, Defendant–Appellee.

No. 00–4248.

United States Court of Appeals, Sixth Circuit.

March 21, 2002.

---

Before JONES and COLE, Circuit Judges; GWIN, District Judge.[*]

## OPINION

COLE, Circuit Judge.

This case arises as the result of a foundry closing in Portsmouth, Ohio. Plaintiff–Appellant James Bond and several other named co-workers ("Plaintiffs") of the now-defunct foundry sued their union, Defendant–Appellee United Steelworkers of America, AFL–CIO ("USWA" or "Defendant") in the United States District Court for the Southern District of Ohio, alleging the union breached its duty of fair representation under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 and under § 9(a) of the National Labor Relations Act, as amended, 29

U.S.C. § 159(a). District Judge Herman J. Weber initially dismissed Plaintiffs' § 301 suit for failure to state a claim under Fed.R.Civ.P. 12(b)(6); upon reconsideration, he dismissed Plaintiffs' § 301 and § 9(a) suits on summary judgment. Fed. R.Civ.P. 56.

Because Plaintiffs have failed to produce sufficient evidence under either § 301 or § 9(a) to show that the USWA's actions were arbitrary, discriminatory, or made in bad faith, we AFFIRM the judgment of the district court.

## I. BACKGROUND

### A. Facts

Lucas–Varity Corporation ("Varity") operated a Portsmouth, Ohio, foundry through its wholly owned subsidiary Dayton–Walther Corporation. The Varity Portsmouth foundry manufactured a single product, cast iron brake drums for heavy trucks, and serviced a single customer, another division of Varity. The sixty-year-old building it occupied had deteriorated, the equipment was outdated, and neighbors frequently complained of noisome odors and clouds of black dust emanating from the facility.

The foundry operated at a net loss from 1994 until its closure in June of 1997, losing between $2 million and $4 million a year. In 1996, two other foundries approached Varity officials about the possibility of becoming the sole supplier of brake drums for Varity. This prompted the company to consider whether it should continue to manufacture its own brake drums or purchase them from the outside.

Prior to this new business proposition, however, Varity's subsidiary had negotiat-

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

ed a five-year collective bargaining agreement ("CBA") with Local 5035 of the USWA, which contained the following terms:

Article XVI, entitled "Termination," stated:

This Agreement shall become effective on the first day of August, 1995, and shall remain in full force and effect except as may be changed in accordance with the terms of this Agreement, until 12:01 a.m. August 1, 2000 and from one (1) year to year thereafter, unless either party shall serve notice of no less that [sic] sixty (60) days but not before seventy (70) days prior to midnight, July 31, 2000 or any anniversary thereafter, to the other party of its desire to change or terminate the Agreement. All notice shall be given by certified mail, return receipt requested.

J.A. at 572.

Article III, § 1, entitled "Rights and Responsibilities of the Company," stated:

a. It is the responsibility of the Company to maintain discipline and efficiency in its plant and, to the best of its ability, provide suitable and steady employment for its employees.

b. The right to hire, transfer, promote, establish and post rules to govern the conduct of the employees, discharge or discipline for cause and to maintain discipline and efficiency of employees is vested exclusively in the company except as these rights may be affected by any of the other provisions of this Agreement. In addition, the products to be manufactured, the location of plants, the schedules of production, the methods, processes and means of manufacturing are solely and exclusively the prerogative of the Company so long as they do not violate this Agreement.

J.A. at 536–37.

On February 25, 1997, USWA staff representative Carroll Floyd, Local 5035 members, and Varity officials met at a Super 8 motel in Portsmouth to discuss the financial health of the foundry. Varity presented a "Facility Rationalization Study" that outlined problems with the Portsmouth facility—the fact that it was landlocked, its deteriorating infrastructure, high maintenance costs, antiquated equipment, and environmental problems. Varity presented three business alternatives to Floyd and the local members: it could refurbish the Portsmouth facility, build a new foundry, or purchase all of its casting requirements from the outside. The first and second alternatives threatened a negative cash flow for the company every year from 1997 to 2000, while the third promised a positive cash flow. Varity predicted that even with a $28 million or $30 million investment in a refurbishment or a new build, it still would be able to purchase drums more cheaply in the open market. Although the meeting had been called ostensibly to get union members' "input on this serious situation," Varity denied that it was "trying to get anything" or "expect[ed] anything" from the union.

Floyd and Local 5035 officials met with Company representatives again on March 3 and for a third time on March 17, 1997. At both meetings union officials mooted different proposals to try to save the facility. Union officials noted the possibility of a $2 million community assistance grant, but this suggestion was deemed inadequate to cover the necessary expenses. Floyd and the union members suggested a $12 million partial refurbishment, using Local 5035 members to do the work. and the installation of a second production line. Varity rejected this proposal as well, noting that Varity could get the same savings in the open market, with no expense, that it could get from a refurbishment for $12 million.

On April 8, 1997, Varity's representatives met with Floyd and the local officials at a Holiday Inn. Varity recapitulated the various proposals and then announced that senior management had decided to close the foundry, effective June 8, 1997. Floyd asked when shutdown negotiations would begin, and the parties agreed to begin negotiations on April 11.

Shortly thereafter, Floyd contacted USWA attorney, Daniel Kovalik, about the local members' legal options. Kovalik's opinion was that the union had "next to no leverage against the company" and that neither the CBA nor general principles of law prevented Varity from proceeding with a complete shutdown.

On April 20, 1997, David Strickland, a member of Local 5035, filed a grievance on behalf of all of the foundry employees who faced termination. The grievance declared that "[t]he notice of the plant closing issued on 4–8–97 is in violation of article XVI of our contract." The grievance procedure takes place in multiple steps, which may culminate in arbitration. Varity rejected the grievance at steps one and two, stating simply, "There has been no contract violation." At step three, Floyd, as staff representative, was responsible for prosecuting the grievance. After researching cases in an arbitration book and consulting with Kovalik, Floyd concluded that the grievance had no merit. Although Local 5035 committee members objected, Floyd withdrew the grievance in a meeting with Varity on May 13.

As the Strickland grievance was being resolved, the parties continued with their shutdown negotiations. Floyd, a delegation of Local 5035, and a USWA benefits technician, Gerald Sokolow, met with Varity from April to June 1997 to work out an agreement. In its final Portsmouth Closing Agreement ("Closing Agreement"), the negotiating team secured severance pay, a sixty-one day extension of health benefits, early qualification for pension for nineteen employees, and lifetime health coverage for seventeen employees who would have otherwise been ineligible. In exchange for these benefits, Varity required that the USWA waive and release all claims the USWA might have against the company under the CBA or federal labor law. In addition, it required that individual employees sign a waiver and release covering any individual action an employee might have as a result of the plant closure. Those that did not sign the release would not be eligible for the benefits negotiated under the Closing Agreement.

Believing that the USWA had breached its duty to represent them fairly, and that Varity had breached the CBA, Plaintiffs brought this action on June 5, 1997. The Portsmouth foundry shut its doors on June 8, 1997.

### B. Procedure

Plaintiffs filed this action June 5, 1997, in the Ohio Court of Common Pleas. Defendants removed the case to the United States District Court for the Southern District of Ohio on June 6. Plaintiffs amended their complaint twice, resulting in the current actions brought under § 301 of the Labor Management Relations Act and § 9(a) of the National Labor Relations Act.[1]

USWA filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss on December 2, 1998. Finding nothing in the CBA that would have obliged Varity to negotiate its decision to close the plant, Judge Weber dis-

---

1. Plaintiffs settled with Varity, and those claims were dismissed with prejudice on July 12, 1999.

missed the § 301 claim on September 29, 1999. *See Vencl v. Int'l Union of Operating Eng'rs,* 137 F.3d 420, 424 (6th Cir. 1998) (holding that to succeed in a § 301 action, a plaintiff must show *both* that the company violated the collective bargaining agreement *and* that the union breached its duty of fair representation). As to the § 9 claim, Judge Weber found that the majority of the allegations were merely the § 301 pleadings in disguise and hence, foreclosed by our decision in *Adcox v. Teledyne, Inc.,* 21 F.3d 1381, 1387 (6th Cir.1994). However, because Plaintiffs had also alleged that some of their individual rights, outside those guaranteed by the CBA, had been waived by the union, he allowed that portion of the § 9 claim to proceed.

On July 14, 1999, USWA filed a motion for summary judgment pursuant to Fed. R.Civ.P. 56, and on December 2, 1999, filed a "renewed" motion for summary judgment. Plaintiffs filed a motion to reconsider the court's earlier dismissal of their § 301 claim. On September 8, 2000, Judge Weber issued his decision. Concluding that not only was there no legal basis, but also insufficient evidence to support the § 301 claim, Judge Weber reaffirmed his prior decision. On the remaining § 9 issue, he found no evidence that the USWA had waived the individual rights of local union members or had conducted the shutdown negotiations in a manner that was arbitrary, discriminatory, or in bad faith. Because the case presented no genuine issue of material fact, he granted summary judgment for Defendants and dismissed the case.

On October 6, 2000, Plaintiffs brought this appeal.

## II. DISCUSSION

Because we find Judge Weber's disposition of the § 301 and the § 9 claims well-reasoned and thorough, we adopt the district court's opinions of September 29, 1999, and September 8, 2000, as our own.

We write only to note that even if we were to agree with the Plaintiffs, and find Varity's obligation under the CBA ambiguous and therefore a triable issue, Plaintiffs have failed to show the second requirement of a hybrid § 301 action, that the USWA breached its duty of fair representation by acting in a way that was either (1) arbitrary, (2) discriminatory, or (3) evidence of bad faith. *See Vencl,* 137 F.3d at 424; *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 584 (6th Cir.1994).

Plaintiffs' brief is muddled as to which of these three elements they wish to demonstrate; nevertheless, Plaintiffs' primary contention is that the USWA breached its duty because Floyd failed to adequately investigate Varity's obligations under the CBA and erroneously withdrew the Strickland grievance. We disagree.

Typically, the failure of the union must be egregious. Mere mistakes in judgment or simple negligence is not sufficient to constitute a failure to fairly represent. *See Poole v. Budd Co.,* 706 F.2d 181, 184–85 (6th Cir.1983). Despite Plaintiffs' attempts to characterize Floyd as having recklessly failed to protect the union members, it is obvious from the record that he did his best to investigate the situation and salvage what he could for Varity's workers. Soon after learning of the proposed closure, he sought Kovalik for legal counsel. Kovalik advised him that the union had no legal recourse, either by law or by the CBA, to stop the shutdown; it was not irrational for Floyd to rely on counsel's expertise. When Strickland filed the grievance under Article XVI of the CBA, Floyd again contacted Kovalik, did his own research, and concluded that the grievance should be withdrawn because the "chances were zilch" of winning.

Plaintiffs' argument that somehow Floyd was obliged to expend his resources on a wasteful grievance process are not well taken.[2] As the Supreme Court stated in *Vaca v. Sipes,* "Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Plaintiffs rely upon our decision in *Schoonover v. Consol. Freightways Corp.,* 147 F.3d 492 (6th Cir.1998), to argue that Floyd's failure to actively investigate and pursue the grievance evinced a failure of the union's duty to fairly represent its members. In *Schoonover,* a truck driver was fired for intentionally damaging the pedal of his tractor trailer. Schoonover filed a grievance with his local union. Although the trucking company presented metallurgical evidence to defend its termination decision, Schoonover's representative from the union failed to gather any scientific evidence, met only once with Schoonover, and made a presentation of only fifteen minutes at the hearing. A divided panel of this Court found that such perfunctory representation could have been considered a breach of duty by a jury and upheld the jury verdict. *Id.* at 495–96.

The case at bar can be distinguished. In Schoonover's case, the jury had reason to believe that investigation of the facts prior to the grievance proceeding would have benefitted the union member. In this case, Floyd had a reliable and rational reason to believe that neither the law, nor the CBA prevented Varity from closing the plant; he had consulted with counsel and had consulted his own arbitration materials. This was not a case of Floyd failing to investigate the legal position of Varity; he had done so. Instead, the evidence demonstrates that Floyd thought that nothing could stop the shutdown, whatever reasons the company gave, or whatever concessions he offered. Having reasonably concluded that he had no legal tools to prevent a shutdown, Floyd was obliged to devote his energies to negotiating a closing deal. It is apparent from the record that Floyd, in combination with other USWA officials, worked diligently to extract concessions from Varity as part of crafting the Closing Agreement. Floyd had ample reason to conclude that there was no point in squandering time and relationship capital on a fruitless grievance process.

In short, while the union members may disagree with the USWA's legal conclusions respecting Varity's obligations under the CBA, and while the union members may have been disappointed by the performance of USWA agents, there is insufficient evidence that the USWA behaved in such a fashion as would constitute a breach of duty.

### III. CONCLUSION

For the foregoing reasons, the district court judgment is AFFIRMED.

---

2. Plaintiffs' argument that there is a fifty percent chance of winning in arbitration says nothing about the probability of success of any *particular* arbitration.