*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0142P (6th Cir.)
File Name: 04a0142p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

CARL BAUER et al.,
　　　　　*Plaintiffs,*

CRAIG M. BENNETT et al.,
　　　　　*Plaintiffs-Appellants,*

　　　　　　*v.*

RBX INDUSTRIES, INC. et al.,
　　　　　*Defendants-Appellees.*

No. 02-4327

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 02-00415—James Gwin, District Judge.

Argued: March 12, 2004

Decided and Filed: May 17, 2004

Before: NELSON, MOORE, and FRIEDMAN, Circuit
Judges.[*]

─────────────────

[*] Judge Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

─────────────────

### COUNSEL

**ARGUED:** John L. Wolfe, Akron, Ohio, for Appellants. David F. Dabbs, McGUIRE WOODS LLP, Richmond, Virginia, Melvin P. Stein, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** John L. Wolfe, Akron, Ohio, for Appellants. David F. Dabbs, Jonathan P. Harmon, McGUIRE WOODS LLP, Richmond, Virginia, Melvin P. Stein, UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, Clair E. Dickinson, BROUSE McDOWELL, Akron, Ohio, for Appellees.

─────────────────

### OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge. The contentious relationship between a corporation and a group of its former employees following the closing of a manufacturing facility in Barberton, Ohio is the milieu for this appeal. At issue is a significant question of whether federal courts have the ability to hear claims filed pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, when an accord reached between the corporation and the employees' union terminates a previously negotiated Collective Bargaining Agreement ("CBA"), the breach of which provided the factual basis for both claims. Additionally, we must evaluate the scope of the "right to sue" provision of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411, to determine whether a viable LMRDA claim has been alleged.

Plaintiffs-Appellants ("Plaintiffs") were a group of former employees[1] at the Barberton, Ohio mixing facility owned by Midwest Rubber Custom Mixing Corp. ("Midwest"), which in turn was controlled by RBX Industries, Inc. ("RBX"). Following the closure of the Barberton facility, the Plaintiffs' national union, the United Steel Workers of America, AFL-CIO ("USWA"), and RBX signed a Settlement agreement (the "Settlement") in April 2002, which abrogated the previously negotiated CBA and purported to resolve all disputes between RBX and its former employees. The Plaintiffs filed an action against RBX, the USWA, and the employees' local union, Local Union # 77L, United Steel Workers of America ("Local 77L")[2], alleging a "hybrid" § 301 breach of contract/breach of duty of fair representation claim under the LMRA, 29 U.S.C. § 185(a), and various claims relating to the denial of benefits under ERISA. 29 U.S.C. § 1132.

The district court granted RBX's and the Unions' motions for summary judgment and denied Plaintiffs' motion to

---

[1] Initially, Carl Bauer and twenty-one other former employees of the Barberton, Ohio factory filed this action. Five new plaintiffs were added in April 2002. Only twenty of the twenty-seven Plaintiffs are parties to the appeal. The named Plaintiffs represent approximately 17% of the bargaining unit formerly represented by Local Union # 77L, United Steel Workers of America ("Local 77L").

[2] The Plaintiffs brought their action against RBX Industries, Inc. and RBX Corporation (collectively "RBX"). RBX Corp. is a Delaware corporation, whose parent, RBX Holdings, Inc., had purchased Midwest's stock in 1990. RBX Industries, also known as RBX Reorganized, was RBX Corp.'s successor-in-bankruptcy. Midwest merged into RBX Industries on August 16, 2001. The Plaintiffs also named as defendants three benefits plans and RBX in its capacity as administrator of those plans: the Midwest Rubber Custom Mixing Corp. Union Hourly Employees Pension Plan ("Pension Plan"); the Midwest Rubber Supplemental Unemployment Benefits Plan ("SUB Plan"); and the Midwest Rubber Custom Mixing Corp. Union Hourly Employees Medical and Life Insurance Plan ("Medical Plan").

amend their complaint to include a claim under the LMRDA, 29 U.S.C. § 411. On appeal, the Plaintiffs argue that because the district court did not have jurisdiction over their § 301 hybrid claim, it erred in reaching the merits of the § 301 and ERISA claims, as it should have dismissed the action without prejudice. The Plaintiffs also argue that the district court erred in denying their motion to add the LMRDA claim. We agree that the district court lacked jurisdiction over the Plaintiffs' § 301 and ERISA claims, and consequently we **VACATE** the judgment of the district court and **REMAND** with instructions that the district court dismiss the Plaintiffs' action without prejudice. We **AFFIRM** the district court's denial of the Plaintiffs' motion to amend the complaint to add an LMRDA claim.

## I. BACKGROUND FACTS AND PROCEDURE

### A. The 1997 CBA

The effects of the Settlement can not be fully understood without explaining the 1997 CBA, which the Settlement superseded. The 1997 CBA was the latest in a series of pacts negotiated between Midwest and Local 77L, and it tied in several previously negotiated benefit plans. Two of these plans are pertinent[3]: the Midwest Rubber Supplemental Unemployment Benefits Plan ("SUB Plan") and the Midwest Rubber Custom Mixing Corp. Union Hourly Employees Medical and Life Insurance Plan ("Medical Plan"), the latter of which is also referred to as the "Agreement on Welfare Benefits Programs." With regard to the Medical Plan, the 1997 CBA stated, "It is recognized by the parties hereto that the provisions as outlined in Section 1 Paragraph (a) of [the CBA] may be applied to and shall include the [Pension Plan] and the Agreement on Welfare Benefits Programs . . . ." Joint

---

[3] Midwest and the employees had also previously negotiated the Pension Plan, which is not at issue in this appeal and which was not affected by the Settlement.

Appendix ("J.A.") at 1022 (art. XV, § 2(a)). Additionally, the 1997 CBA explicitly incorporated the SUB Plan. J.A. at 1022 (art XV, § 2(b)) ("It is recognized by the parties hereto that the separate Agreement on [SUBs] . . . is a part of this Agreement."). Either Midwest, a committee appointed by Midwest, or RBX, as Midwest's successor, administered all three plans and possessed discretionary authority to determine eligibility, disburse benefits, and manage disputes.

### 1. The SUB Plan

The SUB Plan gave the Barberton employees "certain Benefits in the event of their layoff," J.A. at 284 (art. I), which were "intended to supplement any State System Benefits," J.A. at 284, rather than replace them. The SUB Plan provided for the disbursement of benefits and separation payments at amounts commensurate with seniority. A general trust fund served as the Plan's only financial source. Midwest was required to pay a certain amount into the fund each month, but Midwest's contribution could be offset or reduced by the costs of providing medical benefits for laid-off employees.

A Midwest employee at Barberton earned SUBs based upon several factors. An employee accrued "credit units" for each work week completed. The amount of the employee's SUBs consequently depended on seniority, whether that employee had used his or her credit units for prior benefits, and the status of the "fund position." The SUB fund position was determined by dividing the current market value of the fund's assets by a number proportional to the number of covered employees. Credit units were canceled if the fund position fell below a certain level. For example, if the fund position fell below 80%, credit units were canceled in a manner that rewarded seniority. If the fund position fell below 4%, no SUBs were payable. The fund position also determined the payment of separation payments: separation payments would be distributed only if the fund position equaled or exceeded 80%. If the fund position fell below

80%, the separation payments would be deferred until the fund position exceeded 80%. The SUB Plan explicitly stated that employees did not have any rights or vested interests in the assets of the fund. J.A. at 322 (art. IX, § 5). Furthermore, the SUB Plan's existence was tied to the CBA's: "Upon the termination of the [CBA], [Midwest] shall have the right to continue the Plan in effect and to modify, amend, suspend, *or terminate* the Plan, except as may be otherwise provided in any subsequent [CBA] . . . ." J.A. at 326 (art. X, § 4(a)) (emphasis added).

### 2. The Medical Plan

The Medical Plan gave employees medical benefits and life insurance both during employment and in the event of a layoff. Following termination of employment, an employee would continue to receive medical benefits "for a period of 90 days beginning with the first day of layoff." J.A. at 217 (art. IV, § K.1(a)). An employee would also be covered for an additional time period beyond the first ninety days, which varied as a function of the number of SUBs an employee would expect to receive given an employee's available credit units on the last day worked prior to the layoff. For example, if an employee were entitled to thirty-three weeks of SUBs, as determined by the employee's seniority and the SUB Plan's fund position, the employee would receive ninety days *plus* five months of full medical coverage. *See* J.A. at 218 (art. IV, § K.1(b), (c)). If the SUB fund position dropped below 4% at the time of layoff, the employee would not be entitled to any SUB benefits, which consequently would limit the employee's post-layoff medical coverage to ninety days. Furthermore, if the SUB Plan were terminated, a laid-off employee would only be entitled to ninety days of medical care following the date of termination.

## B.  RBX's Bankruptcy Proceedings

RBX entered bankruptcy proceedings in December 2000 after one of its creditors filed an involuntary Chapter 11 bankruptcy petition against it.[4]  On June 29, 2001, RBX filed a motion seeking authority to close the Barberton plant and to transfer all operations to another RBX-owned plant in Tallapoosa, Georgia in the hopes that consolidating RBX's mixing operations into one location would maximize RBX's profits from that sector.  As required by the bankruptcy court, RBX sent a letter dated June 29, 2001, to the USWA and Rose Jones ("Jones"), who was the USWA representative serving Local 77L, explaining that RBX would be closing the Barberton facility subject to the approval of the bankruptcy court.  It emphasized that "the Midwest operation has been losing money for two years and, at current sales levels, our employees could work at minimum wages and no benefits and the Midwest operation would still fail to reach profitability levels competitive with our other locations." J.A. at 331 (RBX Letter 06/29/01).  On July 12, 2001, the bankruptcy court granted RBX's motion to discontinue operations at Barberton.

## C.  The Closing of the Barberton Plant

After learning of RBX's intentions, Local 77L met with representatives of the government of the City of Barberton in early August to explore ways of forestalling the plant's closure.  This meeting was not fruitful because no one from RBX attended the meeting.  Quickly recognizing that the plant closure was a *fait accompli*, the parties entered into "effects" negotiations.

---

[4]The bankruptcy petition was filed in the Bankruptcy Court for the District of Delaware, but the case was transferred to the Bankruptcy Court for the Western District of Virginia.

## 1.  Negotiations Between RBX and the Unions

### a.  The First Proposal

On August 14, 2001, Jones, acting as the USWA representative, and several Local 77L officers met with RBX's attorneys, led by William Twomey ("Twomey") in what became a contentious meeting.  Twomey commenced the meeting by claiming that no severance payments would be available because the SUB fund position was below 4% on account of health care benefits paid to laid-off employees in recent years.  Several Barberton employees expressed anger regarding the apparent lack of severance pay, accusing RBX of having negotiated the SUB Plan in bad faith.  J.A. at 916 (Minutes, 08/14/01).  The union representatives sought to persuade RBX not to close the plant, suggesting that the City of Barberton might be able to provide assistance, but Twomey made it clear that RBX had no choice but to close the plant.

Failing to reach any solution on August 14, the parties reconvened the following day.  RBX provided Local 77L with an official Worker Adjustment and Retraining Notification Act ("WARN") notice, as is required by federal statute. *See* 29 U.S.C. § 2102 (a).  The WARN letter, dated August 14, 2001, clarified that "all employees in the collective bargaining unit at Midwest will be permanently laid off sometime during the period between October 15th, 2001 and 14 days thereafter."  J.A. at 50 (WARN Letter).  The union representatives complained to no avail that the notice was late.  The parties then turned their attention to the issue of severance pay.  RBX offered one of two alternatives to the Barberton employees:  1) each employee would receive a lump-sum payment equal to one week of severance pay for each year of service, plus a $1,000 cash bonus, but no medical insurance beyond the first ninety days; or 2) each employee would receive one week of severance pay for every year of service paid on a weekly basis, plus company-paid health insurance for the same period of time.  The Local 77L

representatives took the offer back to the union membership, which rejected the proposal on August 19.

#### b. The Second Proposal

The parties reconvened on October 8, 2001. Twomey proposed a new offer: each employee would receive one week's severance pay for each year of service, plus RBX would pay its share of each employee's health premium, which would be applied to the employee's COBRA premium. The membership rejected this proposal on October 12, demanding increased severance pay and longer lasting medical benefits.

#### c. The Third Proposal

A third meeting was held on November 9, 2001. RBX offered a sharply scaled-back proposal. RBX would pay a lump-sum severance payment of *one day's* pay for each year of service, plus RBX would pay for health benefits through November 30, 2002 (by applying the premium RBX would have paid towards an employee's COBRA payments). However, the employees would have to pay a $250 monthly co-payment from June 1 to November 30. The membership eventually turned down this last proposal on December 30, 2001.

### 2. The Relationship Between Local 77L and the USWA

As predicted in the WARN letter, RBX closed the Barberton facility and fired nearly all of its employees on October 15, 2001. Pursuant to Article IX of the USWA Constitution, the USWA placed Local 77L in Administratorship on November 29, 2001, suspending the Local 77L officers because the plant had closed and naming Rose Jones as the Administrator of Local 77L. Owing to the large number of unresolved disputes between the employees and RBX, the USWA filed multiple grievances on behalf of the Barberton employees. Several of these grievances were

filed by Jones in response to a letter sent by RBX, which informed the Barberton employees that their health insurance ended on January 13, 2002, ninety days after the closing of the plant. Some Local 77L members objected to the manner in which Jones handled the filing of grievances and the effects negotiations. In January, a Local 77L member, Douglas Sauerbrei, requested that Jones be removed as administrator. However, during a February 13, 2002, hearing held by the USWA to determine if the Administratorship was properly established, there was allegedly no objection to the establishment of the Administratorship or to Jones's abilities in that role.

### D. The Lawsuit and the Settlement

#### 1. The Initial Complaint

The Plaintiffs filed their complaint on March 5, 2002, setting forth two claims for relief. In the first claim, the Plaintiffs alleged that RBX breached the 1997 CBA and that the two Unions breached their duties of fair representation in violation of § 301 of the LMRA. In the second claim, the Plaintiffs alleged that RBX "neglected and refused to pay," J.A. at 35-36 (Pl. Compl.), the benefits provided in the three plans, which entitled the Plaintiffs to receive the benefits and punitive damages pursuant to ERISA.

#### 2. The Settlement

In March 2002, the USWA met again with RBX officials. Twomey made clear that RBX was lowering its offer and that he did not believe the Plaintiffs' lawsuit would succeed. RBX appeared to have the upper hand in these negotiations, mainly as it believed it did not have any obligation to provide health insurance coverage beyond ninety days because the SUB fund position fell below 4% in early 2001. RBX made no contributions to the SUB Plan trust fund in 2001 "because the required contributions were reduced, under the terms of the SUB Plan, by the cost of providing medical insurance to

employees on layoff." J.A. at 481 (McMillan Aff.). The Unions and the Plaintiffs countered that even if the fund position dipped below 4% at some point in October 2001, the fund position was over 4% in September 2001 and that was the position that should have been used to calculate the benefits.

Twomey drafted a settlement proposal for Jones to review, and the USWA ultimately agreed to its terms. The Settlement was signed and completed on April 5, 2002, although the membership of Local 77L never voted on the matter. The Settlement bound RBX to pay all Barberton employees: 1) nine days of pay, equal to the number of days that the plant closing notice was allegedly late; and 2) ninety days of RBX's share of health insurance premiums, plus payment of the same amount toward COBRA premiums for a number of additional weeks equal to the number of years worked. J.A. at 101. Additionally, the Settlement resolved many of the outstanding employee grievances pursued by the USWA.

The Settlement superseded the 1997 CBA and all the Plans, except for the Pension Plan. J.A. at 99 ("This Agreement shall be controlling and superior to any inconsistent provisions of the currently applicable [CBA] between the Parties and to any other document or documents . . . ."); J.A. at 100 ("Any and all other severance provisions and/or other benefits . . . including but not limited to the [SUB] Plan, [the Medical Plan] and any other plans . . . hereafter shall be null and void in their entirety."). The Settlement contained a provision regarding the SUB Plan, which stated that RBX met its SUB Plan funding obligations, that there were insufficient funds to pay a benefit, and that the fund assets would be used to administer the SUB Plan with the remainder to be distributed to the Barberton employees. Finally, the Settlement purported to resolve all lingering issues, providing: "[T]his Agreement provides a full remedy for the effects of the Company's decision and . . . no further negotiation of the decision to close and/or the effects of that decision shall be required," J.A. at 100, and "This Agreement

completely and finally resolves all disputes, grievances and disagreements between the Parties[,] and the Company has no continuing obligations under the [CBA]." J.A. at 103.

### 3. The Continuing Legal Proceedings

The Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction on March 26, 2002, to prevent RBX and the Unions from completing the effects negotiations that eventually produced the Settlement. The district judge denied the motion for a temporary restraining order as moot on April 16, 2002, because the Settlement had already been signed. On May 2, 2002, the district court heard arguments regarding the Plaintiffs' renewed motion for a preliminary injunction. The district judge denied the motion for a preliminary injunction, ruling that the Plaintiffs failed to demonstrate a strong likelihood of success on the merits.

The Plaintiffs then sought to amend their complaint on July 11, 2002, alleging a claim under the LMRDA, 29 U.S.C. § 411, that the Defendants deprived them of the "right to sue" promised by the LMRDA. RBX and the Unions opposed this amendment because it was filed only three weeks before the close of discovery and because, they asserted, it would not survive a Rule 12(b)(6) motion to dismiss. The district judge agreed with the Defendants and denied the motion to amend on futility grounds. The Plaintiffs moved for reconsideration of this denial, arguing that the Settlement had divested the district court of subject matter jurisdiction, and thus the Unions, by allegedly acting in concert with RBX, effectively destroyed the Plaintiffs' lawsuit, all of which violated the LMRDA. The district court declined to reconsider its decision.

Both defendants moved for summary judgment in early August. The district court granted both motions on October 17, 2002. The district court did not rule against the Plaintiffs based upon a jurisdictional defect. Instead, it held that the Plaintiffs could not succeed on their § 301 claim

because: 1) the Union had the authority to negotiate and enter into the settlement agreement; 2) the Union did not breach its duty of fair representation in representing the Plaintiffs; and 3) RBX did not breach the 1997 CBA. The district court granted the Defendants' motions for summary judgment and dismissed the case. Plaintiffs timely appealed, and we have jurisdiction over the final order of the district court pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standards of Review

Normally, we review de novo a grant of summary judgment. *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 346 (6th Cir. 2001). However, here we must first determine whether the district court properly had jurisdiction to issue a summary judgment. We review de novo questions of subject matter jurisdiction. *Caudill v. N. Am. Media Corp.*, 200 F.3d 914, 916 (6th Cir. 2000). Additionally, the denial of the Plaintiffs' motion to amend is also reviewed de novo. "Denial of leave to file an amended complaint is usually reviewed under an abuse of discretion standard." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1104 (6th Cir. 1995). "When, however, the district court denies the motion to amend on grounds that the amendment would be futile, we review denial of the motion *de novo*." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002). The district court ruled on such "futility" grounds, and therefore we review de novo the denial of leave to amend.

### B. The District Court's Jurisdiction over the § 301 Claim

We are presented with a counterintuitive appeal in which the Plaintiffs argue that the district court did not have jurisdiction over their own § 301 claim. Accordingly, the Plaintiffs ask us to vacate the judgment of the district court and to dismiss the action without prejudice. RBX, and to a more limited extent the Unions, contend that the district court

had jurisdiction, and thus its opinion is valid. Therefore, we are faced with the slightly strange situation in which the Plaintiffs seek to undermine the jurisdictional basis for their own claim, but their opponents, in order to maintain an advantageous judgment, suggest the opposite. We hold that the district court erred in reaching the merits of the § 301 claim: the Settlement superseded the 1997 CBA, making a § 301 claim impossible and consequently precluding the district court from asserting jurisdiction.

### 1. The Plaintiffs' § 301 "Hybrid" Claim

Section 301(a) of the LMRA provides the jurisdictional basis for the Plaintiffs' breach of contract/breach of duty of fair representation claims, which are deemed "hybrid" § 301 claims:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Plaintiffs' claim actually comprised two causes of action that are "inextricably interdependent," *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983) (quotation omitted), such that "[t]o prevail against either the company or the Union, [Plaintiffs] must not only show that [the company acted] contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71 (1976). "[I]f the first claim anchored in the employer's alleged breach of the [CBA] fails, then the breach of duty of fair representation claim against the union must necessarily fail with it." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990).

Jurisdiction in a § 301 claim is premised upon the existence of a contract, which an employer subsequently breaches. Section 301 opens the federal courthouse only to "[s]uits for violation of contracts." 29 U.S.C. § 185(a). "Where there is no contract, the courts have no jurisdiction." 1 Patrick Hardin & John E. Higgins, Jr., *The Developing Labor Law* 1321 (4th ed. 2001); *see also* 5 N. Peter Lareau, *National Labor Relations Act: Law & Practice* § 41.02[2][a], at 41-7 (2d ed. 2003) ("Jurisdiction under Section 301 is premised on the existence of a viable contract (usually a [CBA]); courts *do not* have Section 301 jurisdiction over *expired* [CBAs].");  *Johnson v. Pullman, Inc.*, 845 F.2d 911, 914 (11th Cir. 1988) ("A federal court has jurisdiction over a suit for a violation of a collective bargaining agreement under section 301 only while the agreement is in force.").

Initially, the Plaintiffs pleaded that RBX breached the 1997 CBA by failing to pay SUBs, by failing to fund the SUB Plan, and by terminating the employees' health benefits. Then, the Settlement superseded the 1997 CBA, rendering the SUB Plan and the Medical Plan null and void. The only contract in existence after April 2002 was the Settlement. The Plaintiffs do not allege that RBX breached the Settlement, and to the extent they argue that the Settlement was invalid, "[d]istrict courts do not . . . possess subject matter jurisdiction under Section 301(a) in cases concerning the validity of a contract." *Heussner v. Nat'l Gypsum Co.*, 887 F.2d 672, 676 (6th Cir. 1989); *see also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657 (1998) ("'Suits for violation of contracts' under § 301(a) are not suits that claim a contract is invalid, but suits that claim a contract has been violated."). Thus, the Plaintiffs are unable to demonstrate that a contract existed, which RBX could have breached.

The absence of a contract and the consequent inability to prove a breach of that contract condemn jurisdictionally the entire hybrid § 301 claim. In *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir. 1994), a group of former employees filed a

§ 301 claim alleging that Teledyne breached a 1988 CBA by refusing to pay certain benefits after closing down the facility at which the employees worked. As part of the shutdown, the workers' union and Teledyne reached a Plant Closing Agreement that settled the disputes over the benefits and that expressly superseded the 1988 CBA. On appeal, we affirmed the district court's dismissal of the § 301 claim for lack of jurisdiction, ruling that there could be no breach of contract claim when the Plant Closing Agreement abrogated the 1988 CBA that was allegedly violated. *Id.* at 1385-86. We held that if there was no breach-of-contract claim, there could be no § 301 duty-of-fair-representation claim against the union because a plaintiff in a § 301 claim must show both a breach of a CBA *and* a breach of the duty of fair representation. *Id.* at 1386-87. In *Heussner*, we confronted a similar case in which former employees alleged a breach of a 1984 CBA that had been superseded. We ruled that we only "possess[ed] subject matter jurisdiction in cases involving an alleged violation of an *existing* [CBA]." *Heussner*, 887 F.2d at 676 (emphasis added). Because the 1984 CBA had been abrogated, we affirmed the district court's dismissal for lack of subject matter jurisdiction. *Id*; *see also Storey v. Local 327, Int'l Bh'd of Teamsters*, 759 F.2d 517, 523 (6th Cir. 1985) ("If the plaintiffs had relied only on section 301 as a jurisdictional basis for this action, the absence of a collective bargaining agreement at the time of the alleged misconduct of the defendants would have been significant."). There is virtually no difference between the facts of *Adcox* and *Heussner* and this case. Thus, the Settlement negated our jurisdiction over the Plaintiffs' § 301 action.[5]

---

[5] There is some ambiguity over whether the expiration or supersession of a labor contract that is the subject of a § 301 claim is better viewed as raising a jurisdictional problem or, instead, a failure-to-state-a-claim problem. On the one hand, federal courts have limited jurisdiction in the area of federal labor law because the National Labor Relations Board "was Congress' chosen instrument for effecting national labor policy." *Storey v. Local 327, Int'l Bh'd of Teamsters*, 759 F.2d 517, 522 (6th Cir. 1985). Generally, the NLRB has jurisdiction over labor disputes. "When

an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). However, § 301 carved out a limited exception to the NLRB's exclusive jurisdiction: "Section 301 of the [LMRA] specifically created jurisdiction in the district courts to hear suits for violation of [CBAs] and contracts between labor organizations." *Storey*, 759 F.2d at 522. When there is no existing labor contract, the violation of which is the kernel of a § 301 suit, the district courts may not have jurisdiction, because any allegations of unfair labor practices should be litigated before the NLRB.

On the other hand, the expiration or supersession of a contract can be seen as a non-jurisdictional issue. The lack of a labor contract may simply demonstrate that a plaintiff has failed to state a claim upon which relief can be granted, but not deprive a federal court of jurisdiction. The Supreme Court, in a case that postdates our precedents in *Adcox v. Teledyne, Inc.*, 21 F.3d 1381 (6th Cir. 1994), and *Heussner v. National Gypsum Co.*, 887 F.2d 672, 676 (6th Cir. 1989), stated:

> [§ 301] simply erects a gateway through which parties may pass into federal court; once they have entered, it does not restrict the legal landscape they may traverse. Thus if, in the course of deciding whether a plaintiff is entitled to relief for the defendant's alleged violation of a contract, the defendant interposes the affirmative defense that the contract was invalid, the court may, consistent with § 301(a), adjudicate that defense.

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657-58 (1998). This language suggests that a federal court has jurisdiction to rule that a labor contract is invalid when the legality of the contract is raised as an affirmative defense to a plaintiff's claims that the contract has been violated. One reading of this dicta is that a federal court may possess jurisdiction over a plaintiff's § 301 claim based on a violation of a CBA, but the defendant may raise the affirmative defense of the invalidity (here expiration or supersession) of the CBA; in such a case the federal court could dismiss the claim because relief cannot be granted for the violation of a contract that no longer exists. Another reading of this quotation is that federal courts only possess jurisdiction to rule that a contract is invalid because of some defect, e.g., lack of consideration or anticipatory breach, but that federal courts do not have jurisdiction when there is no dispute that the contract in question does not exist.

Comparing (1) our precedents in *Adcox* and *Heussner* and (2) the general principle that federal courts have limited jurisdiction in this area, with a lone ambiguous statement by the Supreme Court, we believe that our prior rulings that a federal court does not have jurisdiction to hear a

## 2. The Impact of the Jurisdictional Divestment

The parties disagree over what should be the next step once we rule that the district court did not have jurisdiction over the § 301 claim. The Plaintiffs argue that the district court should have dismissed their § 301 claim without prejudice, but should have retained jurisdiction over their ERISA claims. Pls. Br. at 31-33. Accordingly, the Plaintiffs believe that the district court's opinion, which holds that summary judgment was proper because there were no genuine issues of material fact regarding the USWA's alleged breach of its duty of fair representation, should be disregarded. For their part, RBX and the USWA suggest that the district court properly granted summary judgment. They ask the panel to affirm the district court's opinion as "a straightforward application of binding precedent." Unions Br. at 19; *see also* RBX Br. at 16-20.

Generally, when a court lacks jurisdiction over a particular claim for relief, that court cannot proceed. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quotation omitted). No formal motion is needed to raise the issue, and an objection to subject matter jurisdiction can be raised at any time at either the trial or appellate level. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1393, at 773-75 (2d ed. 1990).

---

§ 301 claim premised upon an expired or superseded contract are still binding on us.

Dismissal is undoubtedly the appropriate action, but the remaining question is whether prejudice should attach. The Supreme Court recognized that "[a]t common law dismissal on a ground not going to the merits was not ordinarily a bar to a subsequent action on the same claim." *Costello v. United States*, 365 U.S. 265, 285 (1961). The Supreme Court has declined to alter this common-law rule, writing, "If the first suit was dismissed for . . . want of jurisdiction . . . the judgment rendered will prove no bar to another suit." *Id*. at 286; *see also Mitan v. Int'l Fid. Ins. Co.*, No. 00-1554, 2001 WL 1216978, at *5 (6th Cir. Oct. 3, 2001) ("Dismissals of actions that do not reach the merits of a claim, such as dismissals for lack of jurisdiction, ordinarily are without prejudice."). In *Heussner*, a case that like *Adcox* is directly on point, we affirmed the district court's dismissal without prejudice when the district court lacked subject matter jurisdiction pursuant to § 301. *Heussner*, 887 F.2d at 675. We therefore vacate the district court's judgment because the court was without jurisdiction to consider whether the Unions breached their duty of fair representation. The district court should have dismissed the § 301 claim without prejudice and should have refrained from granting summary judgment on the § 301 issue because it did not have jurisdiction to do so. We do not reach the merits of the duty-of-fair representation component of the § 301 claim because of this jurisdictional limitation.

## C. The District Court's Jurisdiction over Plaintiffs' ERISA Claims

The parties further disagree on whether the Settlement also divests the district court of jurisdiction over the Plaintiffs' ERISA claims. The Plaintiffs believe that no matter the fate of their § 301 claim, the district court properly retained jurisdiction over the ERISA claims and should have ruled upon them. We disagree and hold that just as the Settlement divested the district court of jurisdiction over the § 301 hybrid claim, so too it eliminated the district court's ability to hear the ERISA claims.

### 1. The Plaintiffs' ERISA Claims

The Plaintiffs brought their action against the Plans and RBX as the administrator of the Plans, pursuant to several different ERISA provisions. First, the Plaintiffs claimed that RBX violated 29 U.S.C. § 1109(a) by breaching their fiduciary duties as described by 29 U.S.C. § 1104(a). *See* 29 U.S.C. § 1132(a)(2) ("A civil action may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."); 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such plan* any losses to the plan resulting from each such breach.") (emphasis added); 29 U.S.C. § 1104(a)(1)(B) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."). The main relief sought by the Plaintiffs for the breach of fiduciary duties was a monetary settlement that inured to them.[6] Second, the Plaintiffs sought "to recover

---

[6] The Plaintiffs' desired remedy of compensatory and punitive damages payable to the Plaintiffs is not available as a remedy for a breach-of-fiduciary-duties claim. A party alleging breach of fiduciary duties cannot seek personal remuneration. "[A] cause of action under § 1132(a)(2) permits recovery to inure *only to the ERISA plan*, not to individual beneficiaries." *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1390 (6th Cir. 1994) (emphasis added). Thus, the Plaintiffs' breach-of-fiduciary-duties claim would not survive a motion to dismiss. Furthermore, a company does not breach its fiduciary duties under ERISA when it terminates a non-vested welfare benefit plan. Fiduciary duties do not apply to the termination of a welfare benefit plan, *see Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 844 (6th Cir. 2003), because the company does not act in a fiduciary capacity in amending or terminating a non-vested plan. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) ("We have recognized that employers who are also

benefits due to [them] under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B). Third, the Plaintiffs sought to recover compensatory and punitive damages under 29 U.S.C. § 1132(a)(3), even though § 1132(a)(3) does not specifically mention the availability of punitive damages and provides only for equitable relief.[7]

## 2. Jurisdiction Over the ERISA Claim

The district court did not have jurisdiction over the Plaintiffs' ERISA claims because the Settlement rendered null and void the welfare benefit plans upon which the ERISA claims were premised. Our ruling above that the district court did not have jurisdiction to hear the § 301 claim does not automatically deprive the district court of the ability to hear the ERISA claims; the court's power to entertain the ERISA claims springs from a different statutory provision, as the court has jurisdiction over a § 1132(a)(1)(B) action pursuant to 29 U.S.C. § 1132(e)(1). Nonetheless, the Settlement that divested the district court of jurisdiction over the § 301 claim has the same effect on the ERISA claims. In *Adcox*, we held that because a settlement agreement superseded a CBA, which included a benefit plan, "the district court lacked jurisdiction under § 1132 to entertain a challenge to the Plant Closing Agreement's validity." *Adcox*, 21 F.3d at 1388. This

---

plan sponsors wear two hats: one as a fiduciary in administering or managing the plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust. The fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity." (citations omitted)).

[7] The district court did not analyze the Plaintiffs' ERISA claims. It instead focused solely on whether the USWA had the authority to negotiate and enter into the Settlement and whether USWA breached its duty of fair representation in doing so. Nonetheless, by granting the Defendants' motions for summary judgment in their entirety, dismissing the Plaintiffs' claims, and terminating the action, the district court implicitly ruled against the Plaintiffs on their ERISA claims.

court concluded that "[b]ecause . . . the [CBA] pursuant to which plaintiffs seek the special distribution benefits is no longer 'in force,' the district court lacked subject matter jurisdiction over the . . . claim." *Id.* In *Heussner*, we reached the exact same conclusion when a plaintiff argued that 29 U.S.C. § 1132 "provided an independent basis for district court jurisdiction over claims [for pension, health, insurance, and unemployment benefits] based on the superseded [CBA]." *Heussner*, 887 F.2d at 677. We held, "Section 502 [§ 1132] does not give subject matter jurisdiction to federal courts over actions to collect benefits due under an expired collective bargaining contract. Because Section 502 authorizes suits for benefits to be brought in federal court *only while a collective bargaining contract remains in force*, the district court in this case did not have jurisdiction . . . ." *Id.* (citations omitted) (emphasis added).

There is no doubt that the Settlement superseded the Medical and SUB Plans. First, the Medical and SUB Plans were fully incorporated into the CBA, and the Settlement expressly trumped all previous CBAs and agreements. Additionally, the Settlement explicitly stated that "[a]ny and all other severance provisions and/or or [sic] other benefits, of whatever nature, including but not limited to the [SUB] Plan [and the Medical Plan] . . . shall be null and void in their entirety." J.A. at 100 (Settlement). Because the agreements that created the plans are no longer in force, *Heussner* and *Adcox* apply, and the district court did not have jurisdiction over the ERISA claim. The Plaintiffs urge us to reconsider these precedents, but we are bound by our prior decisions.

The Plaintiffs offer several responses, all unsuccessful variations of the assertion that *Heussner* and *Adcox* do not apply because the Settlement either did not or could not supersede the Medical and SUB Plans. First, the Plaintiffs claim that the Medical and SUB Plans were not a part of the CBA. This is a highly dubious point, given that the 1997 CBA specifically incorporates the SUB Plan as part of the CBA and applies the CBA's duration period to the Medical

Plan.  It is also a moot point because the Settlement not only expressly superseded the CBA but also explicitly abrogated the Medical and SUB Plans.

Second, the Plaintiffs try to demonstrate, to no avail, that the terms of the Medical and SUB Plans precluded their elimination by the Settlement.  Each plan, however, can by its terms be abrogated by subsequent agreement or by the residual effect of the termination of other benefit plans.  The Medical Plan generally states that termination of the CBA does not affect the duration of the Medical Plan.  J.A. at 224 (art. V, § 6).  The Settlement, however, did not just terminate the CBA; it specifically voided the Medical Plan as well.  The only provision of the Medical Plan to address the termination of the Plan states, "Notwithstanding the termination of the Plan in accordance with its terms, the benefit programs provided for therein shall be continued for a period of 90 days following such termination."  J.A. at 224 (art. V, § 7).  The Settlement provided for the ninety-day coverage required in the event of the Medical Plan's termination.  J.A. at 101 (Settlement, § 9.b).

Additionally, Article four, section K(3) of the Medical Plan, which is the operative provision dealing with continued medical benefits following layoff, states, "In the event that the [SUB] Plan shall be terminated in accordance with its terms, prior to the termination of this Plan, Section K(1)(b) shall thereupon cease to have any force or effect."  J.A. at 219 (art. IV, § (K)(3)).[8]  The fate of the continuing-coverage provisions of the Medical Plan is tied with that of the SUB Plan.  The interdependence of the Plans is logical given that the length of the continuing coverage depended on the number of weeks of SUBs to which an employee was entitled. If the SUB Plan no longer existed or the funding position

---

[8]Section K(1)(b) sets out the schedule for how long each employee will receive continuing coverage beyond the first ninety days after layoff.

dropped below 4%, no continuing medical coverage beyond the ninety days would be afforded to the employees.

Similarly, the SUB Plan was terminable.  The SUB Plan provided, "*So long as the [CBA] of which this Plan is a part shall remain in effect*, the Plan shall not be . . . terminated." J.A. at 326 (art. X, § 4(a)) (emphasis added).  "Upon the termination of the [CBA], the Company shall have the right to continue the Plan in effect *and* to . . . terminate the Plan . . . ."  J.A. at 326 (art. X, § 4(a)) (emphasis added).  The Settlement superseded the 1997 CBA, and therefore the terms of the SUB Plan did not prevent its termination.

Third, the Plaintiffs contend that the benefits conferred by these two plans were vested and thus could not be affected by the Settlement.  The terms of the agreement, the plain language of ERISA, and our caselaw interpreting ERISA belie such a statement.  The SUB Plan explicitly declared that the employees did not have a vested interest in the assets of the SUB fund or in the company contributions to the fund. J.A. at 322 (art. IX, § 5).  The Medical Plan did not explicitly state that the health care benefits were vested.  ERISA distinguishes between welfare benefit plans and pension plans.  *Compare* 29 U.S.C. § 1002(1) *with* 29 U.S.C. § 1002(2)(A).  Welfare benefit plans include severance benefit plans, *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990), medical, surgical, or hospital care benefit plans, 29 U.S.C. § 1002(1)(A), and unemployment benefit plans.  *Id.*  "Welfare benefit plans are not subject to mandatory vesting requirements under ERISA, unlike pension plans.  Therefore, there is no statutory right to vested . . . benefits, and the parties must agree to vest a welfare benefit plan." *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (citation omitted).  "As a matter of law under ERISA, one of the key differences between welfare and pension plans is that welfare plan benefits do not vest." *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 844 (6th Cir. 2003).  We have explained,

Apparently, Congress chose not to impose vesting requirements on welfare benefit plans for fear that placing such a burden on employers would inhibit the establishment of such plans. In drawing the line between employer actions subject to the fiduciary duty requirement and those not, we must avoid any rule that would have the effect of undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement.

*Adams*, 905 F.2d at 947 (citation omitted). Plaintiffs are thus simply incorrect in their protestations that their welfare benefits were vested interests, particularly given that the terms of the Plans either specifically disclaim vesting or are silent on the issue.

In sum, the district court did not have jurisdiction to hear the Plaintiffs' ERISA claims because the Settlement terminated the SUB and Medical Plans. Our precedents, such as *Adcox* and *Heussner*, clearly dictate that federal courts have no power to hear an ERISA claim regarding a welfare benefit plan that has been superseded. On remand, the district court should dismiss the ERISA claims.

**D.  The Denial of the Plaintiffs' Motion to Amend**

Finally, the Plaintiffs appeal the district court's denial of their motion to amend their complaint to add a claim under § 101 of the LMRDA, 29 U.S.C. § 411(a). Although the district court most likely would have been justified in denying the motion to amend because of its tardiness — the Plaintiffs filed the motion three months after the deadline for amending the pleadings, two months after the Settlement that allegedly gave rise to the LMRDA claim, and only eleven days before the Defendants' summary judgment motions were due — the district court declined to permit the Plaintiffs to add an

LMRDA claim on the basis of futility. We review de novo its decision.[9]

The Plaintiffs' proposed LMRDA claim alleged that the USWA and RBX "conspired together to violate and to limit Plaintiffs' rights . . . to institute and to proceed with this action in this Court." J.A. at 432 (Pls. Motion for Leave to File a Second Am. Compl.). Recognizing that the Settlement divested the district court of jurisdiction over the § 301 claim, the Plaintiffs chiefly assert that the agreement to the Settlement left the Plaintiffs without relief in federal court. The Plaintiffs contended that this deprived them of the "right to sue" ensconced in the LMRDA. Because the LMRDA does not serve the role envisioned by the Plaintiffs and because they did not state a claim upon which relief can be granted, we agree with the district court's denial of the motion to amend on futility grounds.

"The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982). It was "designed specifically to regulate internal union affairs." *Hrometz v. Local 550, Int'l Ass'n of Bridge Constr. & Ornamental Ironworkers*, 227 F.3d 597, 601 (6th Cir. 2000) (quotation omitted). The LMRDA

[P]laced emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union

---

[9]Even though the district court did not have jurisdiction over the Plaintiffs' § 301 and ERISA claims, there is an independent jurisdictional basis for the LMRDA claim such that the district court could have properly heard the case had it permitted the Plaintiffs to amend their complaint. *See* 29 U.S.C. § 412 ("Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.").

membership and in turn loss of livelihood. Such protection was necessary to further the [LMRDA]'s primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships.

*Finnegan*, 456 U.S. at 435-36. As part of the "Bill of Rights of Members of Labor Organizations," § 101 of the LMRDA in part mandates,

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided*, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further*, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

29 U.S.C. § 411(a)(4). To establish a prima facie violation of this right to institute a legal action, a plaintiff must demonstrate that he or she engaged in the protected conduct, the union retaliated against the plaintiff, and the plaintiff suffered an injury as a result of the union's action. *Thompson v. Office & Prof'l Employees Int'l Union*, 74 F.3d 1492, 1506 (6th Cir. 1996).

There are no cases that support the Plaintiffs' belief that the actions of RBX and the USWA give rise to a valid LMRDA claim. The plain language of the statute also demonstrates that the Plaintiffs' claim, if added, would not survive a motion to dismiss. First, RBX is not liable under § 411(a)(4). The statute only prohibits "labor organizations" from inhibiting a plaintiff's right to file suit against that organization. It does not authorize a cause of action against employers.

Because they take it out of context, Plaintiffs misunderstand the meaning of the statute's second proviso, which states that a union cannot infringe a member's right to sue, *provided that* "no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition." *See* Pls. Br. at 54 (citing 29 U.S.C. § 411(a)(4)). This provision limits the union member's complete right to initiate a legal proceeding when the member's suit is funded by the employer. The exception exists to prevent employers from interfering in the relations between union members and the unions, but it does not create an independent basis for employer liability under the LMRDA. Funding by an interested employer of a union member's suit does not make the employer liable; rather, such funding only limits the union member's absolute freedom to initiate legal proceedings. The exception, which if applicable would hurt, rather than help the Plaintiffs' alleged LMRDA claim, is not relevant here in any event given that RBX and the Plaintiffs are adversaries, not allies.

Second, the claim must fail as asserted against the USWA, because the union has not limited the Plaintiffs' ability "to institute" its action. The Plaintiffs successfully instituted their action against both RBX and the USWA in federal court and proceeded to litigate the case for over a year. The Plaintiffs have not even alleged, let alone offered any evidence, that the USWA retaliated against them for engaging in this lawsuit. It is true that the Settlement has impeded the Plaintiffs' ability to *win* their lawsuit in federal court by

divesting the district court of subject matter jurisdiction and by purporting to settle all claims between the Barberton employees and RBX. However, the LMRDA does not create a cause of action against unions for actions that diminish the chances for a member to succeed in a lawsuit against a union.

To the extent that the Plaintiffs could argue that the USWA retaliated against Plaintiffs' lawsuit by negotiating and signing the Settlement, this contention would be misguided; if successful, such an assertion would significantly limit the ability of unions to represent the entire bargaining unit. Any suggested causal connection between the Settlement and the lawsuit is tenuous. The Plaintiffs comprised less than 20% of the total membership of Local 77L, but the USWA was charged with obtaining some modicum of benefits for all the Barberton employees. There is no evidence that the USWA signed the Settlement to impact the court's jurisdiction over the action, even though the Settlement had that incidental effect. Signing a settlement that has such a secondary effect does not constitute the type of behavior that § 411(a)(4) is designed to prohibit.

Additionally, subjecting unions to liability under the LMRDA for actions such as the USWA's would place into direct conflict the LMRDA and the duty of labor organizations to represent their members under the National Labor Relations Act. A union is obligated to represent all the members of a bargaining unit in negotiations as the exclusive bargaining agent. 29 U.S.C. § 159(a); *see also Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("It is now well established that, as the exclusive bargaining representative . . . the Union had a statutory duty fairly to represent all . . . employees."). If a union were forced to refrain from negotiating plant-closing settlements, which are applauded by some union members and derided by others, whenever a faction of the union membership filed suit over an alleged breach of a CBA, the union could harm the non-litigious members by refusing to negotiate until the conclusion of the lawsuit. The union could also be liable to the nonparty union members for its failure to

negotiate. To hold that the USWA's actions here violated the LMRDA would establish a troublesome precedent, because it would prevent unions from reaching settlements when such settlements potentially could have a secondary effect on pending litigation filed by a small percentage of the bargaining unit's members.

### III. CONCLUSION

In sum, the Settlement divested the district court of jurisdiction over both the § 301 and ERISA claims. The district court erred when it proceeded to reach the merits of the case. We **VACATE** the district court's grant of summary judgment and **REMAND** with instructions to dismiss the Plaintiffs' action without prejudice. The district court's denial of the motion to amend the complaint to add an LMRDA claim is **AFFIRMED**, because the Plaintiffs did not state a claim that would survive a motion to dismiss.